836 A.2d 605

## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

## James F. BRASKEY.

**Misc. AG No. 69, Sept. Term, 2002.**

Court of Appeals of Maryland.

Nov. 24, 2003.

426

428

Melvin Hirshman, Bar Counsel, Dolores O. Ridgell, Asst. Bar Counsel for Atty. Grievance Comm., for petitioner.

C. Trent Thomas, Frostburg, for respondent.

Argued before BELL, C.J., ELDRIDGE,* RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

RAKER, J.

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition with this Court for disciplinary action against James F. Braskey, alleging violations of the Maryland Rules of Professional Conduct. The Commission charged respondent with violating Maryland Rules of Professional Conduct 1.5 (Fees),[1] 1.7 (Conflict of interest: General

---

* Eldridge, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Rule 1.5 provides, in pertinent part, as follows:

"(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

rule),[2] 1.15 (Safekeeping property),[3] 8.4 (Misconduct),[4] Maryland Rules 16–604, 16–606, and 16–609 (regarding trust ac-

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent."

**2.** Rule 1.7 provides, in pertinent part, as follows:

"(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents after consultation."

**3.** Rule 1.15 provides, in pertinent part, as follows:

"(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

\* \* \*

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved."

**4.** Rule 8.4 provides, in pertinent part, as follows:

"It is professional misconduct for a lawyer to:

counts),[5] and Maryland Code (1989, 2000 Repl.Vol.) § 10–306 and § 10–606 of the Business Occupations and Professions Article (regarding trust money and trust accounts).[6] Pursuant to Maryland Rule 16–752(a), we referred the matter to

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice.

5. Rule 16–604 provides as follows:

"Trust account—Required deposits.

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person."

Rule 16–606 provides as follows:

"Name and designation of account.

An attorney or law firm shall maintain each attorney trust account with a title that includes the name of the attorney or law firm and that clearly designates the account as 'Attorney Trust Account', 'Attorney Escrow Account', or 'Clients' Funds Account' on all checks and deposit slips. The title shall distinguish the account from any other fiduciary account that the attorney or law firm may maintain and from any personal or business account of the attorney or law firm."

Rule 16–609 provides as follows:

"Prohibited transactions.

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

6. Maryland Code (1989, 2000 Repl.Vol.) § 10–306 of the Business Occupations and Professions Article provides as follows:

"Misuse of trust money.

A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer."

Judge W. Kennedy Boone of the Circuit Court for Washington County to make findings of fact and proposed conclusions of law. Judge Boone held an evidentiary hearing and concluded that respondent had violated Rules 1.5(a), 1.7(b), 1.15(a) and (c), 8.4(c) and (d), Maryland Rules 16–604, 16–606, 16–609, and § 10–306 of the Business Occupations and Professions Article.

## I.

Judge Boone made the following findings of fact and conclusions of law:

### FINDINGS OF FACT

"Respondent is age 56 and in reasonably good health, except for an asymptomatic congenital pituitary gland condition and stress/depression as a result of the protracted proceedings herein, for which he has been prescribed paxil. However, for the time period 1989–1999, he was in 'good health' and was not hindered or impaired in his practice of law by medical or psychiatric/psychological difficulties.

"Respondent received his undergraduate degree from Frostburg State University and Juris Doctorate from the University of Baltimore, and admitted to practice in Maryland in 1977. During the period concerning the complaint, 1989–1999, Respondent was a sole general practitioner with offices in Grantsville, Frostburg and Cumberland with support staff. His primary practice involved residential/commercial real estate closings with approximately 15%–20% of

---

Maryland Code (1989, 2000 Repl.Vol.) § 10–606 of the Business Occupations and Professions Article provides as follows:
"Penalties.

\* \* \*

(b) Attorney trust accounts.—A person who willfully violates any provision of Subtitle 3, Part I of this title, except for the requirement that a lawyer deposit trust moneys in an attorney trust account for charitable purposes under § 10–303 of this title, is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both."

his practice time representing plaintiffs in personal injury matters.

"On or about November 30, 1989 the Respondent was retained by John Dormio (Dormio) to represent him in a personal injury claim as a result of an automobile accident which occurred November 8, 1989, Dormio being a long time acquaintance of the Respondent. Respondent agreed to represent Dormio on a contingency legal fee basis, with the written Retainer Agreement providing for Respondent to be paid one-fourth (1/4) of any settlement and one-third (1/3) of the recovery if suit was filed, with Dormio responsible for all incurred costs. Dormio, being seriously injured, incurred over Thirty Thousand Dollars ($30,000.00) in medical bills which were covered through Medicare, administered by Blue Cross/Blue Shield (BC/BS), which timely notified Respondent of its subrogation lien on any proceeds recovered.

"Respondent negotiated an automobile liability insurance policy limits settlement in the amount of Twenty-five Thousand Dollars ($25,000.00), with the settlement check received on February 11, 1992, which was deposited to an account at First Union National Bank and Trust titled 'Braskey Law Office, P.A., Attorney Trust Account, IOLTA Account' (IOLTA).

"On February 11, 1992 the Respondent disbursed Six Thousand Two Hundred Fifty Dollars ($6,250.00) to himself as a one-fourth (1/4) contingency legal fee, as well as Seven Hundred Fifty Dollars ($750.00) reimbursement for costs incurred during representation. The balance of the settlement proceeds, Eighteen Thousand Dollars ($18,000.00), remained in the IOLTA account, pending resolution of the BC/BS lien.

"On April 16, 1992 Respondent forwarded documentation to BC/BS on behalf of Dormio and made telephone calls to BC/BS on or about July 22, 1992 and November 18, 1994 in an effort to make known he was holding funds subject to their lien, attempting to negotiate a settlement. After November 18, 1994 Respondent made no further attempts to communicate with BC/BS. Respondent was not knowl-

edgeable or experienced in the practice of negotiating and finalizing an agreement concerning BC/BS subrogation liens, which led to no further activity on this issue.

"Prior to February 1996 Respondent met with Dormio to discuss options concerning the BC/BS lien. Respondent proposed, and it was alleged to have been agreed, that Dormio and Respondent would equally divide $18,000.00 held in the trust account if there was no further contact by BC/BS. It was also allegedly agreed that Respondent would defend Dormio against any legal action taken by BC/BS and indemnify Dormio against any loss. Respondent also agreed to cease any negotiations with BC/BS, thereby giving up his claim to a 25% lien recovery fee he believed he was entitled to from BC/BS. This verbal agreement was never reduced to writing.

"In February or March 1996 Respondent learned Dormio had suffered a stroke, had become incapacitated, was residing in a nursing home and no longer competent to handle his affairs. His nieces, Joanna Rase (Rase) and Gail Richards (Richards) had received legal power of attorney to handle Dormio's affairs.

"On March 25, 1996 Respondent disbursed Five Thousand Dollars ($5,000.00) to himself from the $18,000.00 held in his trust account as partial legal fee for Dormio representation, and on April 8, 1996 disbursed an additional Four Thousand Dollars ($4,000.00) to himself as balance of legal fees owed, for a total of Nine Thousand Dollars ($9,000.00).

"In May 1996 Respondent contacted Rase and Richards, consulted with them, and offered to split the $18,000.00 that remained from the personal injury settlement. Rase and Richards refused the offer and demanded the entire $18,000.00 be placed in interest-bearing account. Over a year transpired with no further activity, and a second office consultation occurred on June 26, 1997, whereby Respondent advised of the Nine Thousand Dollar ($9,000.00) fee disbursement, and Rase/Richards again requested the funds be placed in an interest-bearing account with the Nine Thousand Dollar ($9,000.00) legal fee disbursed replaced.

"On July 10, 1997 the Respondent wrote to Rase and Richards and represented the entire $18,000.00 received from the Dormio settlement was presently in his trust account, but on July 14, 1997 Respondent deposited Nine Thousand Dollars ($9,000.00) from his personal assets to the trust account to make up the deficit. Rase and Richards being dissatisfied, on July 31, 1997, consulted with attorney Howard J. Price, who advised them that he would not have handled the Dormio case in the same manner as Respondent, and further instructed Rase/Richards of their right to file a complaint with the AGC.

"On August 15, 1997 Respondent disbursed Eighteen Thousand Dollars ($18,000.00) from his trust account and opened an interest-bearing account titled in Respondent's name alone; however, on June 11, 1999 Respondent withdrew Nine Thousand Dollars ($9,000.00) from the account for himself. In correspondence with Rase and Richards the Respondent made false and misleading statements concerning status of the disputed funds as evidenced by attachments to the Complaint, Petitioner's Exhibit 1. This matter remained unsolved, and on July 28, 1999 Rase and Richards filed a formal complaint with AGC against Respondent.

"On September 23, 1999 Respondent opened a new Trust Account whereby he transferred the remaining Nine Thousand Six Hundred Twenty-four Dollars and Twenty-four Cents ($9,624.24) from his personal interest-bearing account, as well as the Nine Thousand Dollars ($9,000.00) of his personal funds, total Eighteen Thousand Six Hundred Twenty-four Dollars and Twenty-four Cents ($18,624.24).

"On April 27, 2000, Rase and Richards advised Respondent by letter that Dormio was deceased and an estate had been opened, whereby they were appointed personal representatives. On May 22, 2000 Respondent disbursed the entire account funds and made payable to the Estate of John Dormio in the amount of Fourteen Thousand Three Hundred Twenty-two Dollars and Eighteen Cents ($14,-322.18) sent to attorney Howard J. Price, and paid to himself attorney fees in the amount of Four Thousand Five

Hundred Dollars ($4,500.00). Respondent contends that this was an agreement reached with Price, attorney for Rase and Richards. Subsequently, Rase and Richards on behalf of the Dormio estate accepted and negotiated the check.

*Time Line of Significant Events as to Proceeds in Dispute:*

| | | |
|---|---|---:|
| 11/10/89 | Automobile accident wherein Dormio was injured. | |
| 11/30/89 | Respondent retained by Dormio for representation. | |
| 02/11/92 | $25,000.00 settlement received. | |
| 02/13/92 | Deposit of gross settlement proceeds: IOLTA Account No.64–01040 | $25,000.00 |
| 02/13/92 | Respondent disburses: | − $ 7,000.00 |

From IOLTA Account:
| | | |
|---|---|---:|
| (1) Fee: | | $6,250.00 |
| (2) Costs: | | 750.00 |
| | | $7,000.00 |

| | | |
|---|---|---:|
| | Net proceeds remain in IOLTA Account, pending resolution of BC/BS lien | $18,000.00 |
| 03/25/96 | Respondent issues check to himself from IOLTA Account. | − $ 5,000.00 |
| | Remaining net proceeds | $13,000.00 |
| 04/08/96 | Respondent issues fee check to himself from IOLTA Account. | − $ 4,000.00 |
| | Remaining net proceeds | $ 9,000.00 |
| 07/14/97 | Respondent deposits to IOLTA Account. | + $ 9,000.00 |
| | Total in IOLTA Account | $18,000.00 |
| 08/27/97 | Respondent withdraws from IOLTA Account and deposits in savings account No. 216–023015 in his name alone | $18,000.00 |
| 04/18/99 | Accrued interest | + $ 519.76 |
| | Total in savings account | $18,519.76 |
| 06/11/99 | Respondent withdraws, payable to self, from Account No. 216–023025: | − $ 9,000.00 |
| | Remaining proceeds | $ 9,519.76 |

| | | |
|---|---|---|
| 07/28/99 | Complaint filed with AGC. | |
| 09/23/99 | Respondent opens 'Trust' interest-bearing Account No. 216–022841 and deposits: | |
| | (1) Acct. No. 216–023025 | |
| | Balance with interest: | $ 9,624.24 |
| | (2) Respondent's funds: | $ 9,000.00 |
| | | $18,624.24 |
| 04/27/00 | Letter to Respondent from Complainants, advising Estate had been opened for Dormio, now deceased. | |
| 05/22/00 | Respondent disburses from interest-bearing trust account entire proceeds: | |
| | To Estate: | $14,322.18 |
| | Attorney fees: | $ 4,500.00 |
| | | $18,822.18 |

"After the filing of the Complaint Respondent promptly responded and cooperated fully with the AGC by meeting with its Investigator, Mark Friedler, on two lengthy occasions. In addition, he submitted to AGC five (5) pieces of detailed correspondence from August 27, 1999 through May 2, 2000 with documentation to assist the investigation, Petitioner's Exhibits 3–7. Respondent was forthcoming and admitted the error of his ways, even though at the time he did not believe he was involved in any wrongdoing and there was no intent to mishandle funds in his charge to the detriment of his client(s). After being advised of his alleged ethical violations he accepts ignorance is no defense, is truly remorseful, humiliated, and regrets the incident, especially the contents of correspondence sent to nieces of Dormio who held legal power of attorney and later appointed personal representatives of his estate. Simply put, Respondent is not a thief, is basically a good person and hardworking attorney who cares for his clients; however, he admitted wrongdoings. He exercised severe errors in judgments in handling the Dormio case as to monies in his trust and his dealings with Rase and Richards. There are no prior ethical violations against Respondent with AGC. Since the filing of the Complaint in 1999 to date Respondent has been in 'agony' over the matter where he 'can't even go to the

mailbox' and now has two young partners/associates who have become mentors/overseers.

"Without assessing blame or finger pointing, this Complaint has taken entirely too long to work its way through the system, at least from filing through Inquiry Panel hearing (July 28, 1999 to April 26, 2002), almost three (3) years with charges finally filed on October 23, 2002. Even though Respondent was not denied due process in these proceedings, the delay has certainly 'taken its toll,' where he has been 'twisting in the wind.'

"This Court has had no prior contact socially or professionally with the Respondent and was not acquainted with him prior to the date of the merits hearing.

## CONCLUSIONS OF LAW

"Respondent violated *Rule 1.5(a)* in that the Nine Thousand Dollar ($9,000.00) fee taken by him from the Eighteen Thousand Dollar ($18,000.00) net proceeds being held for his client was unreasonable. Said Nine Thousand Dollar ($9,000.00) fee was in addition to the Six Thousand Five Hundred Dollar ($6,500.00) fee taken by Respondent on the gross Twenty-five Thousand Dollar ($25,000.00) settlement.

"Respondent violated *Rule 1.7(b)* in that he had a conflict of interest between client, Dormio, and his obligation to BC/BS in accordance with his agreement to protect their subrogation lien interest.

"Respondent violated *Rule 1.15(a)* in that he did not maintain funds retained on behalf of his client and/or third party in a properly designated trust account.

"Respondent violated *Rule 1.15(c)* in that he withdrew Nine Thousand Dollars ($9,000.00) from his IOLTA trust account on June 11, 1999, when the interests of the Respondent and his client(s) and the Eighteen Thousand Dollar ($18,000.00) proceeds were in dispute.

"Respondent violated *Maryland Rules 16–604, 16–606, 16–609* and *Business Occupations and Professions Article § 10–306* with respect to the Respondent's handling of trust

proceeds. *Section 10–606* concerning criminal sanctions need not be addressed.

"Respondent violated *Rule 8.4(c)* in that he engaged in a deliberate course of misrepresentation in correspondence with Complainants which misrepresented the location of the Eighteen Thousand Dollars ($18,000.00) in controversy and applicable statute of limitations with regard to any causes of actions.

"Respondent violated *Rule 8.4(d)* in that, under the totality of circumstances he attempted to collect an unreasonable attorney fee, which was prejudicial to the administration of justice."

## II. Respondent's Motion to Dismiss

■ We turn first to respondent's motion to dismiss the proceedings on due process grounds. Respondent maintains that he was denied due process because the disciplinary hearing before the Attorney Grievance Commission was not completed within forty-five days in accordance with the requirements of Attorney Grievance Commission Administrative and Procedural Guideline § 5–104.[7] Respondent claims he was prejudiced by the delay in that he suffered anxiety, concern, and emotional stress by living under a cloud of suspicion and hostility.

---

**7.** Attorney Grievance Commission Administrative and Procedural Guideline § 5–104 provides as follows:

"Except where impracticable, the Panel shall complete the hearing within forty-five (45) days from the date that the file is received by the Panel Chairman. An extension of time for prehearing review or for the hearing may be approved by the Panel Chairman with the concurrence of the Committee Vice Chairman for the Circuit, or the Committee Chairman. Any further extensions may only be granted by the Committee Chairman. Postponements and extensions are to be granted only for good cause and are not to be granted as a result of untimely requests for disqualification of Panel members or to permit Respondent to engage counsel. If a panel hearing is not scheduled within forty-five (45) days from the date that the file is received by the Panel Chairman, the Committee Chairman or Committee Vice–Chairman designated by him, may terminate the Panel and reassign the Complaint to a newly constituted Panel."

The complaint that formed the basis of the Attorney Grievance Commission's petition was filed on July 28, 1999. On March 4, 2002, when an Inquiry Panel had yet to be convened, respondent filed a motion to dismiss, claiming a violation of his due process rights. Respondent argued that the Attorney Grievance Commission's internal procedural guidelines provide that the Inquiry Panel hearing shall take place within forty-five days from the date that the file is received by the panel chairperson. The Inquiry Panel hearing was not held until April 26, 2002, 312 days after the panel chairperson received the file. The Inquiry Panel denied his motion to dismiss. According to respondent, his motion was not given proper consideration by the Inquiry Panel.

The Review Board denied respondent's motion to reconsider his dismissal motion and on June 25, 2002, recommended to the Commission that disciplinary charges be filed. The Commission filed its disciplinary petition on October 23, 2002, more than three years after the complaint against respondent was filed.

█ On December 20, 2002, respondent filed a Motion to Dismiss, a Response to Petition for Disciplinary or Remedial Action, and a Request for a Hearing in the Circuit Court for Washington County. On March 31, 2003, Judge Boone heard arguments regarding the Motion to Dismiss. Finding that the Circuit Court lacked the authority to rule on the motion, Judge Boone denied the motion. We note that Judge Boone was correct in denying respondent's Motion to Dismiss. *See Attorney Grievance Commission of Maryland v. Harris*, 310 Md. 197, 200 n. 2, 528 A.2d 895, 896 n. 2 (1987) (holding that the hearing judge, in attorney discipline matters, lacks authority to dismiss the petition).

█ Respondent's Motion to Dismiss is denied. His asserted violations of due process all relate to matters before the Inquiry Panel and Review Board, predating the filing of the Petition for Disciplinary or Remedial Action. Even assuming *arguendo*, that errors occurred in the preliminary proceedings, dismissal of the charges is not an appropriate remedy.

Rule 16–754(b), Answer, explicitly states that "[i]t is not a defense or ground for objection to a petition that procedural defects may have occurred during disciplinary or remedial proceedings prior to the filing of the petition." In *Harris*, 310 Md. at 202, 528 A.2d at 897, we held that "any irregularity in the proceedings before the Inquiry Panel and the Review Board ordinarily will not amount to a denial of due process, as long as the lawyer is given notice and an opportunity to defend in a full and fair hearing following the institution of disciplinary proceedings in this Court." In the instant case, even though the proceedings were delayed, respondent was afforded notice and an opportunity to defend in a full and fair hearing.

 There is no statute of limitations in an attorney disciplinary proceeding and mere delay does not warrant dismissal. We have often noted that the purpose of attorney discipline proceedings is to protect the public by determining a lawyer's fitness to practice law, and that an attorney is entitled only to notice of the charges, and a full and fair hearing, not anything more. *See Attorney Grievance Comm'n v. Goldsborough*, 330 Md. 342, 356–57, 624 A.2d 503, 510 (1993); *Attorney Grievance Comm'n v. Kahn*, 290 Md. 654, 684, 431 A.2d 1336, 1352 (1981); *Attorney Grievance Comm'n v. Engerman*, 289 Md. 330, 346, 424 A.2d 362, 370 (1981) (citing *Bar Ass'n of Balt. City v. Posner*, 275 Md. 250, 255, 339 A.2d 657, 659–60 (1975)).

 A mere delay in disciplinary proceedings is not a basis for dismissal, absent a showing of prejudice. In *Engerman*, where Bar Counsel knew all of the essential facts supporting certain allegations contained in the petition but failed to notify the attorney of the allegations until about two and a half years later, we held that the doctrine of laches did not bar the proceedings, especially where the attorney "failed to show any evidence of prejudice from any delay in commencing disciplinary proceedings." 289 Md. at 346, 424 A.2d at 370. Even in a case where we found the delay "gross and inexcusable," we noted that the attorney was not prejudiced by the delay and

that dismissal "for the sole reason that the Attorney Grievance Commission failed to proceed with the proper dispatch is manifestly unwarranted." *Kahn,* 290 Md. at 684, 431 A.2d at 1352. *See also Anne Arundel County Bar Ass'n v. Collins,* 272 Md. 578, 585, 325 A.2d 724, 728–29 (1974) (finding that the attorney had not shown any evidence of prejudice and rejecting the attorney's exception to the hearing panel's refusal to dismiss the petition on the ground of laches).

■ The Court of Appeals for the District of Columbia stated that "an undue delay in prosecution is not in itself a proper ground for dismissal of charges of attorney misconduct." *In re Williams,* 513 A.2d 793, 796 (D.C.1986). The court further explained:

> "Any betrayal of the trust which the attorney is sworn to keep demands appropriate discipline; a delay in prosecution, without more, cannot override this necessity. The contrary conclusion would mean that, when licensing applicants, we would engage in a form of deceit: our endorsement of an unqualified attorney would belie our simultaneous assertion that attorneys possess the integrity and competence which they must constantly demonstrate in order to earn the privilege of practicing law in the District of Columbia. Speedy trial principles, which in criminal cases are a constitutionally required curb on the abuse of government power, in the disciplinary system take second place to other societal interests."

*Id.* This is a view shared by other courts in addressing delay in attorney disciplinary proceedings. *See, e.g., In re Charges of Unprofessional Conduct Against N.P.,* 361 N.W.2d 386, 393 (Minn.1985); *Ramirez v. State Bar of California,* 28 Cal.3d 402, 169 Cal.Rptr. 206, 619 P.2d 399 (1980); *In re Bossov,* 60 Ill.2d 439, 328 N.E.2d 309, 313–14 (1975); *State ex rel. Nebraska State Bar Ass'n v. McArthur,* 212 Neb. 815, 326 N.W.2d 173, 175 (1982); *In re Wright,* 131 Vt. 473, 310 A.2d 1, 9 (1973). *See also* Annot., Attorneys at Law: Delay in Prosecution of Disciplinary Proceeding as Defense or Mitigating Cir-

cumstance, 93 A.L.R.3d §§ 9, 10, at 1057 (1979). The Supreme Court of Oregon noted as follows:

> "It ought to be made clear, however, that the primary purpose of professional disciplinary proceedings is to protect the public. The punishment of an offending member of the profession is indeed a serious matter, but it is incidental to the protection of the public. If the conduct of a member of the Bar disqualifies him from the practice of law, it would not be in the public interest to dismiss the disciplinary proceedings for no reason other than the Bar's failure to prosecute them with the proper dispatch."

*In re Weinstein,* 254 Or. 392, 459 P.2d 548, 549 (1969), quoted in *Engerman,* 289 Md. at 346, 424 A.2d at 370. This is not to say that delay is irrelevant. If an attorney's ability to present a defense is substantially impaired, and an attorney can show actual prejudice to the defense, there might be a due process violation. *See, e.g., In the Matter of Carson,* 252 Kan. 399, 845 P.2d 47, 55 (1993) (noting an attorney discipline proceeding may be dismissed because of delay, but only if the delay is prejudicial to the defense and respondent convincingly establishes prejudice); *In re Morrell,* 684 A.2d 361 (D.C.1996) (holding that "[i]f delay in the prosecution of disciplinary charges substantially impaired the attorney's ability to defend against the charges ... the Constitution might compel a different analysis: 'A delay coupled with actual prejudice could result in a due process violation' ") (quoting *In re Williams,* 513 A.2d at 797). Respondent has shown no such prejudice.

### III.

This Court has original jurisdiction over attorney disciplinary proceedings. *See Attorney Grievance Comm'n v. Harris,* 371 Md. 510, 539, 810 A.2d 457, 474 (2002). In the exercise of our obligation, we conduct an independent review of the record, accepting the hearing judge's findings of fact unless clearly erroneous. *See Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 97, 797 A.2d 757, 763–64 (2002). The factual findings of the hearing judge will not be disturbed if

they are based on clear and convincing evidence. *See* Md. Rule 16–757(b) (providing that Bar Counsel has burden of establishing averments of the petition by clear and convincing evidence). *See also Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 388, 794 A.2d 92, 100 (2002). We consider the hearing judge's proposed conclusions of law *de novo. See Attorney Grievance Comm'n v. McLaughlin,* 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002).

 Both parties except to Judge Boone's findings of fact and proposed conclusions of law. Bar Counsel has the burden of establishing the allegations by clear and convincing evidence; respondent has the burden of proving the existence of mitigating circumstances by a preponderance of the evidence. *See* Md. Rule 16–757(b). On review, we keep in mind that the findings of the trial judge are *prima facie* correct and will not be disturbed unless clearly erroneous. *Garfield,* 369 Md. at 97, 797 A.2d at 764.

We turn first to respondent's exceptions to the hearing judge's findings of fact. Respondent excepts to the hearing judge's finding that Dormio incurred over $30,000.00 in medical bills which were *covered* through Medicare, administered by Blue Cross/Blue Shield (BC/BS). Respondent argues that "[w]e were not sure how much Blue Cross/Blue Shield (BC/BS) covered." We sustain respondent's exception, as there is no evidence in the record that Medicare covered all of Dormio's medical bills, or that the amount covered was $30,000.00.[8]

 Respondent next excepts to the hearing judge's finding that respondent "made telephone calls to BC/BS on or about July 22, 1992 and November 18, 1994 in an effort to make known he was holding funds subject to their lien." Respondent acknowledges that he made no further attempts to communicate with BC/BS after November 18, 1994. He contends, however, that "[t]here were calls as early as Febru-

---

8. In any case, respondent admitted that "Blue Cross/Blue Shield would have probably have been entitled to the 18 [thousand dollars]."

ary, 1992." Respondent testified that he thought that he contacted BC/BS on the day that the settlement proceeds arrived in February, 1992. Respondent testified that he made calls in February, 1992 to BC/BS. The hearing judge, in his report, made no note of these calls. We are unable to say why the hearing judge omitted reference to respondent's testimony regarding the February calls. It may be that the judge did not believe respondent; it may have been an oversight. In any case, even if the judge believed respondent, the hearing judge is not required to recount all of the evidence presented at the hearing. *See Attorney Grievance Comm'n v. Granger,* 374 Md. 438, 453, 823 A.2d 611, 620 (2003) (noting that "it is elementary that the hearing judge 'may elect to pick and choose which evidence to rely upon' "). Accordingly, this exception is overruled.

Respondent excepts to the hearing judge's finding that "respondent also agreed to cease any negotiations with BC/BS, thereby giving up his claim to a twenty-five percent lien recovery fee he believed he was entitled to from BC/BS." Respondent maintains that he did not agree to cease negotiations with BC/BS. This exception is overruled. The hearing judge was not clearly erroneous in concluding from the evidence presented at the hearing that respondent and the client agreed to cease negotiations and that respondent gave up his claim to any fee he was entitled to receive from BC/BS.

In respondent's Response to Request for Admission of Facts, read into the record by Bar Counsel at the hearing, he admitted that he and Dormio agreed to split the $18,000.00 should they hear nothing further from BC/BS. In his testimony before the Circuit Court, respondent stated:

"I actually didn't decide I wasn't going to contact them. I made a contact then [in November, 1994] and I guess in my own mind, I said, 'Hey this is a big insurance company, they ought to get back to me,' but I didn't totally actually absolutely rule out contacting them again, but I never did."

Judge Boone's inferences are properly supported by the record.

Respondent excepts to the hearing judge's finding that respondent learned in February or March, 1996, that Dormio had suffered a stroke. Respondent asserts that it was more like late April or early May. The record reflects the following testimony as to when respondent learned that Dormio had a stroke:

"So I disbursed two checks to myself. One in March and one in early April simply to just give income for two months for the office. And I had been calling John during this time on the phone. I don't know if I had the secretaries call him or not, but finally I went down to his house and looked in the house. There were lights on in there, but there didn't appear to be anybody living there, and the neighbor came out. And the neighbor says or asked me who I was. I identified myself as 'Jim Braskey, I represent John Dormio.' And I said, 'Where is John?' 'Oh John has had a stroke. He's down at the nursing home.' "

Although respondent's testimony is less than clear as to when he learned Dormio had a stroke, we will sustain his exception because the record is also unclear as to the basis of the hearing judge's finding.[9]

Respondent excepts to the hearing judge's finding that Dormio's nieces demanded at the May, 1996 meeting that the entire amount of the trust proceeds, $18,000.00, be placed in an interest-bearing account. Respondent argues that Dormio's nieces did not make that demand until their second meeting in July, 1997. Both nieces testified that, at the May, 1996 meeting, respondent offered to split the money in the

---

9. We note, however, that the timing of respondent's discovery of the client's stroke in no way affects the hearing judge's conclusions of law. If the facts are as respondent suggests—that respondent's discovery took place in late April or May, respondent issued two checks to himself in the total amount of $9,000.00 *before*, rather than after, he learned that Dormio was incapacitated and no longer handling his own finances. This time difference matters little if, as respondent claims, Dormio had agreed to the $9,000.00 fee. The hearing judge did not find otherwise. Regardless of when respondent learned that his client was incapacitated, respondent took $9,000.00, which the hearing judge concluded was an unreasonable fee.

trust account with them but he did not tell them he had already taken half of the money. Johanna Rase, one of the nieces, testified that she specifically requested at the May, 1996 meeting that respondent place the $18,000.00 in an interest-bearing account. Respondent testified, to the contrary, that the nieces made no such request at that time. Lynne Richards, the other niece, testified that she did not recall whether she made any specific request concerning the funds at the May, 1996 meeting. She did state, however, that respondent represented that the $18,000.00 was at his bank and that the money was going to be held until respondent ascertained whether BC/BS would assert its rights to the money.

■ This Court gives due regard to the hearing judge's opportunity to assess the credibility of the witnesses. *See Attorney Grievance Comm'n v. Awuah,* 346 Md. 420, 433–34, 697 A.2d 446, 453 (1997). Judge Boone was not clearly erroneous in believing the testimony of Ms. Rase and rejecting respondent's version of the meeting. Accordingly, respondent's exception is overruled.

Respondent excepts to the hearing judge's finding that he misrepresented in his correspondence to the nieces on July 10, 1997, that the entire $18,000.00 received from the Dormio settlement was in his trust account at that time. In the letter dated July 10, 1997, the first of four letters sent by respondent to Ms. Richards and Ms. Rase, respondent wrote that the $18,000.00 was in his trust account. Respondent admits that half of the money did not go into his trust account until July 14, 1997. This exception is overruled.

Finally, respondent excepts to the hearing judge's finding that respondent made "false and misleading statements" in correspondence with the nieces. Respondent does not deny that the statements he made in the letters were untrue. He argues that he believed the statements regarding the statute of limitations to have been true when written and that those statements were not meant to be false and misleading. As to the statement about the money in the trust account, respon-

dent represents to this Court that "Seven years have passed. I'm not certain what happened. Perhaps I was unable to get to the bank as soon as I anticipated when I drafted the correspondence. Perhaps I dated the letter incorrectly." Respondent's exception is overruled. His statements in the letters were false and misleading, whether or not he intended to deceive. His state of mind is irrelevant to this exception.

We turn now to respondent's exceptions to the hearing judge's proposed conclusions of law. First, respondent contends that the hearing judge erred in concluding that respondent's withdrawal of $9,000.00 from his IOLTA trust account on June 11, 1999 was a violation of Rule 1.15(c) because the interests of respondent and his client(s) and the $18,000.00 proceeds were in dispute at that time. Respondent argues that there was no genuine dispute because he believed that the statute of limitations on the money had run. Respondent's argument is without merit.

In *Attorney Grievance Commission v. Culver*, 371 Md. 265, 808 A.2d 1251 (2002), this Court held that an attorney violated Rule 16–607(b)(2) [10] by removing from an escrow account money to which he believed he was entitled. We rejected the attorney's argument that he had not violated the Rule because he believed, based on his understanding of the fee agreement with his clients, that he was entitled to the funds. We noted as follows:

---

**10.** Both Rule 1.15(c) and Rule 16–607(b)(2) deal with the prohibition on an attorney's withdrawal of disputed client funds. Rule 16–607(b)(2) provides:

"An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved."

In *Attorney Grievance Comm'n v. Culver*, 371 Md. 265, 269, 808 A.2d 1251, 1253 (2002), the hearing judge concluded that Rule 1.15(c) overlapped with Rule 16–607(b)(2) and that a finding of violation of the latter rule only was more appropriate.

"The test, however, is not whether, when examining the circumstances objectively, one would conclude that respondent was legally entitled to the amount claimed; rather the test should be whether there was in fact a fee disagreement between the parties concerning respondent's entitlement to the amount withdrawn at the time of the withdraw. The rule is unambiguous: an attorney may not withdraw a portion of the deposited funds when the attorney's right to receive that portion is 'disputed' by the client."

*Culver,* 371 Md. at 275–76, 808 A.2d at 1257 (quoting *In re Haar,* 667 A.2d 1350, 1353 (D.C.1995)). The *Haar* court further noted that the dispute need not be "genuine," "serious," or "bona fide." *Id.* Moreover, the court noted that "the word 'dispute' means 'to argue about; to debate; to question the truth or validity of; [or] to doubt.' *The American Heritage Dictionary* 380 (1976)." *Id.* The test as to whether the Rule is violated is an objective one, *i.e.,* whether there was in fact a dispute regarding the funds. An attorney's subjective belief that he or she is legally entitled to the fee is irrelevant. Nor is it relevant that the attorney is legally entitled to the fee if there is a dispute as to the fee. An erroneous belief that one is entitled to a *disputed* fee may be a mitigator with respect to an appropriate sanction to be imposed but it is not relevant to the determination as to whether the Rule is violated.

Respondent and Dormio's nieces disputed the ownership of the $18,000.00. Respondent's letter dated June 9, 1999, in which he calls the nieces "negligent" for not having contacted him or not having filed a lawsuit, is evidence of a dispute as to the entitlement of the money. The nieces' last communication with respondent was their demand that the money be placed in an interest-bearing account on behalf of their uncle. Respondent's belief that the statute of limitations barred their claim to the money does nothing to resolve the dispute. Respondent's withdrawal of $9,000.00 on June 11, 1999 violated Rule 1.15(c). Accordingly, respondent's exception is overruled.

Respondent excepts to the hearing judge's conclusion of law that he violated Rule 8.4(c). In concluding that respondent violated Rule 8.4(c), the hearing judge found that respondent "engaged in a deliberate course of misrepresentation" in correspondence with Dormio's nieces by misrepresenting both the location of the $18,000.00 in controversy and the bar of the statute of limitations to the claim. Respondent claims that he did not engage in dishonest, fraudulent, or deceitful misconduct, nor did he intentionally misrepresent anything to anyone. Essentially, respondent argues that his misrepresentations were not deliberate. First, respondent maintains that there is an innocent explanation for the four-day delay between his July 10, 1997 letter, which indicated that the entire $18,000.00 was in his account, and the date that he actually transferred half of that sum to the account. He suggests that he might have dated the letter incorrectly or have been unable to get to the bank as soon as he had anticipated. Second, regarding the statute of limitations, respondent argues that he believed his statements to be true at the time they were written.

The hearing judge found that respondent misrepresented to his client's nieces that the funds were in a particular account on a specific date and that the statute of limitations later barred their claim. This finding was not clearly erroneous. Whether respondent's misrepresentations were intentional or fraudulent is not relevant in determining whether the Rule was violated. This exception is overruled.

Respondent excepts to the judge's conclusion that he violated Rule 8.4(d). Respondent's final exception is also without merit. Respondent argues that because his conduct was not dishonest, fraudulent, deceitful, or an intentional misrepresentation, he could not have violated Rule 8.4(d). The hearing judge's conclusion that respondent violated Rule 8.4(d), however, was based on respondent's attempt, under the totality of the circumstances, to collect an unreasonable attorney fee, which was prejudicial to the administration of justice. The hearing judge's conclusion that respondent violated Rule

1.5(a) by attempting to collect an unreasonable fee was supported by clear and convincing evidence, and respondent took no exception to that proposed conclusion of law. The collection of an unreasonable fee is conduct prejudicial to the administration of justice. Thus, respondent's final exception is overruled.

■■■ We turn now to Bar Counsel's exceptions. Bar Counsel excepts to two of Judge Boone's findings. Bar Counsel argues that the hearing judge erred in failing to find a violation of § 10–606(b) of the Business Occupations and Professions Article of the Maryland Code. Section 10–606, captioned "Penalties," provides, in pertinent part, as follows:

"A person who willfully violates any provision of Subtitle 3, Part I of this title, except for the requirement that a lawyer deposit trust moneys in an attorney trust account for charitable purposes under § 10–303 of this title, is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 5 years or both."

Md.Code (1989, 2000 Repl.Vol.) § 10–606(b) of the Business Occupations and Professions Article. Although Judge Boone concluded that respondent misappropriated trust funds in violation of § 10–306, he concluded that "Section 10–606 concerning criminal sanctions need not be addressed." Bar Counsel maintains that respondent's violation of § 10–306 necessitates a finding that respondent engaged in criminal conduct under § 10–606(b).

■■■ Bar Counsel's exception is overruled. Judge Boone was correct in concluding that § 10–606(b) need not be addressed. That section is a penalty provision, setting forth the applicable criminal penalties relevant to violations related to attorney trust accounts and the unauthorized practice of law. Except for the provision that trust account violations must be *willful* to constitute a misdemeanor, that section has no bearing on attorney discipline matters.

■■■ Bar Counsel also excepts to the hearing judge's failure to make findings regarding a violation of Rule 8.4(b)—

engaging in criminal conduct which "reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." Bar Counsel argues that respondent's conduct that constituted a violation of § 10–306 would also violate Rule 8.4(b).

In order for a violation of § 10–306, "Misuse of trust money," to constitute criminal conduct, the conduct must have been "willful." *See* § 10–606(b). The hearing judge did not find that respondent willfully misused trust money. Bar Counsel has not proven by clear and convincing evidence that respondent violated Rule 8.4(b) by engaging in criminal conduct. Rather, Judge Boone noted that respondent "exercised severe errors in judgment" in handling the trust proceeds. This finding does not rise to the level of criminal conduct adversely reflecting on respondent's honesty, trustworthiness, or fitness to practice law. Accordingly, Bar Counsel's exception is overruled.

## IV.

We turn now to the appropriate sanction to be imposed. Bar Counsel recommends disbarment. Respondent suggests that the appropriate sanction is a private reprimand.

 The purpose of sanctioning an attorney is to protect the public rather than to punish the errant attorney. *See Attorney Grievance Comm'n v. Powell,* 369 Md. 462, 474, 800 A.2d 782, 789 (2002). The severity of the sanction depends on the particular facts and circumstances of each case, including consideration of any mitigating factors or aggravating factors. *See Attorney Grievance Comm'n v. Angst,* 369 Md. 404, 416–18, 800 A.2d 747, 755 (2002). On occasion, in considering the appropriate sanction to be imposed, we have referred to the *ABA Standards for Imposing Lawyer Sanctions (ABA Standards )*. *Attorney Grievance Comm'n v. Santos,* 370 Md. 77, 88, 803 A.2d 505, 511 (2002); *Attorney Grievance Comm'n v. Sheridan,* 357 Md. 1, 28, 741 A.2d 1143, 1158 (1999); *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 484, 671 A.2d 463, 480 (1996). The *ABA Standards* contemplate four factors to

be considered in imposing a sanction: (1) the nature of the ethical duty or duties violated; (2) the attorney's mental state; (3) the extent of the actual or potential injury caused by the attorney's misconduct; and (4) the existence of aggravating or mitigating factors. See Standard 3.0 of the *ABA Standards for Imposing Lawyer Sanctions, reprinted in ABA Compendium of Professional Responsibility Rules and Standards*, 344 (1999).

 We first address the duties violated by respondent. Respondent collected an unreasonable attorney fee, failed to keep client funds in a separate and properly labeled account, ignored a conflict of interest between his obligations to his client and the insurance company, and made misrepresentations to the personal representatives of his client.

Regarding respondent's mental state, the hearing judge specifically found that respondent "is not a thief." Implicit in this finding is a determination that respondent's misappropriation of funds was not done with the intent to defraud. The hearing judge also noted that respondent was "not knowledgeable or experienced in the practice of negotiating and finalizing an agreement concerning BC/BS subrogation liens," evidencing the judge's view of respondent as inexperienced but not dishonest in his failure to maintain funds in a properly designated trust account. At the same time, however, the hearing judge found that respondent "engaged in a deliberate course of misrepresentation" in his correspondence with Dormio's nieces. Thus, not all of respondent's actions were completely innocent or unintentional.

As to the extent of the actual or potential injury caused by respondent's misconduct, the hearing judge concluded that the $9,000.00 that respondent disbursed to himself on more than one occasion [11] was an unreasonable fee. As a consequence of

---

11. Respondent issued to himself a check for $4,000.00 in March, 1996 and another check for $5,000.00 in April, 1996. He returned $9,000.00 to a trust account in July, 1997. He again took $9,000.00 in June, 1999, after telling Dormio's nieces that the statute of limitations barred any claim to that money.

that unreasonable fee arrangement, respondent disputed the ownership of the funds for several years. Ultimately, respondent placed the settlement proceeds in a proper, interest-bearing account and, after deducting $4,500.00 for services allegedly rendered to BC/BS,[12] sent a check for the remainder to Dormio's nieces. Arguably, the nieces would have received the entire $18,000.00, and received it much sooner, had respondent not insisted upon his entitlement to an unreasonable fee and not agreed to protect the insurance company's subrogation lien interest, which conflicted with the interests of his client.

We must also consider the potential injury caused by respondent's conduct, as respondent's failure to abide by Rule 1.15 regarding trust accounts may have adverse effects on the public's confidence in the legal system as well as the confidence and security of the client's personal representatives in this case. As we stated in *Sheridan*, 357 Md. at 31, 741 A.2d at 1159, "[w]e cannot understate the importance of holding funds in escrow in accordance with Rule 1.15 and how the Rule reinforces the public's confidence in our legal system."

We take note of several mitigating factors. First, respondent has practiced law since 1977 and has no prior discipline history. The hearing judge found that respondent was inexperienced in the practice of negotiating and finalizing an agreement concerning BC/BS subrogation liens, which explains his cessation of attempts to contact BC/BS. The hearing judge noted that respondent was "truly remorseful." Respondent also promptly responded to and cooperated fully with the Attorney Grievance Commission. Respondent's misconduct involved matters pertaining to only one client (and the client's personal representatives). Most importantly, in mitigation, the hearing judge found that respondent "is not a thief, is

---

12. The Attorney Grievance Commission did not charge respondent with any rule violation regarding the $4,500.00 fee that respondent took before he sent a check for the remainder of the trust money to Jack Price, who forwarded that check to Dormio's personal representatives in May, 2000.

basically a good person and hardworking attorney who cares for his clients."

With all of these factors in mind, we also consider our prior cases. We have held that disbarment is the appropriate sanction for "intentional dishonest conduct" and that in cases involving "intentional dishonesty, fraud, misappropriation and the like, we will not accept as compelling extenuating circumstances 'anything less than the most serious and utterly debilitating mental or physical health conditions....'" *Powell,* 369 Md. at 475, 800 A.2d at 789–90 (quoting *Attorney Grievance Comm'n v. Vanderlinde,* 364 Md. 376, 413–14, 773 A.2d 463, 485 (2001)).

In considering the appropriate sanction to be imposed, however, we have distinguished cases of intentional misappropriation from cases of mishandling of funds where the attorney acted with a less culpable mental state, and imposed a lesser sanction than disbarment in the latter cases. *See Attorney Grievance Comm'n v. Hayes,* 367 Md. 504, 789 A.2d 119 (2002); *Attorney Grievance Comm'n v. Jeter,* 365 Md. 279, 778 A.2d 390 (2001); *Sheridan,* 357 Md. 1, 741 A.2d 1143.

In *Sheridan,* the hearing judge found that, among other violations, the attorney misappropriated client funds in violation of Rule 1.15(a); failed to notify his client upon the receipt of funds and failed to provide a requested accounting in violation of Rule 1.15(b); and failed to keep disputed funds separate in violation of Rule 1.15(c). 357 Md. at 28–29, 741 A.2d at 1158. The hearing judge found, however, that the attorney's actions were not intentionally fraudulent. 357 Md. at 12, 741 A.2d at 1149. This Court accepted the hearing judge's finding that the lawyer's action was not intentionally fraudulent and ordered an indefinite suspension with the right to reapply in one year. *Id.* at 35, 741 A.2d at 1162.

In *Hayes,* the attorney commingled client funds with his own funds in his attorney trust account and used that account as an operating and personal account. 367 Md. at 509, 789 A.2d at 122. On four occasions, the attorney also drew checks payable to cash on the account. *Id.* The hearing judge found,

in mitigation, that the attorney's misconduct occurred while the attorney was attempting to assist his client, without compensation, in a matter unrelated to the matter in which he represented the client. *Id.* at 509–10, 789 A.2d at 122–23. The judge further found that the attorney attempted to locate the client, of whom he had lost track, so that funds belonging to the client could be returned. *Id.* at 510, 789 A.2d at 123. Noting that these findings were "inconsistent with and, thus tend[ ] to negate, any dishonest or fraudulent intent," the Court held that "the automatic disbarment rule for misappropriation does not apply, that this is not the kind of willful conduct to which the rule was directed or intended to reach." *Id.* at 519, 789 A.2d at 128–29.

Similarly, in *Jeter,* we recognized the importance of an attorney's intent in mishandling client funds in violation of Rule 1.15. In *Jeter,* the attorney placed settlement proceeds and personal injury protection benefits in his personal bank account rather than an escrow account. 365 Md. at 284, 778 A.2d at 393. He also failed to forward payment to the proper payee until six months after depositing a settlement check. *Id.* The hearing judge found that the attorney's inexperience in handling personal injury cases mitigated his violation. *Id.* at 286, 778 A.2d at 394. The judge also found that the attorney was remorseful and never intended to defraud his client or the proper payee of the funds at issue. *Id.* We stated:

> "Clearly, one who acts with deliberation and calculation, fully cognizant of the situation and, therefore, fully intending the result that is achieved is more culpable than one who, though doing the same act, does so unintentionally, negligently or without full appreciation of the consequences."

*Id.* at 289, 778 A.2d at 395. Recognizing that the attorney was "entitled to the benefit of ... [the hearing judge's] findings," we imposed an indefinite suspension with a right to reapply after six months. *Id.* at 293–94, 778 A.2d at 398.

If respondent's conduct were limited to his failure to maintain settlement proceeds in a properly designated trust account, which the hearing judge found did not implicate any dishonesty, our analysis of respondent's conduct for purposes of a sanction would be relatively straightforward. *Sheridan, Hayes,* and *Jeter* suggest that disbarment might be an inappropriate sanction for respondent's misappropriation of funds because the hearing judge found that respondent was not a "thief." In *Sheridan,* in accepting the hearing judge's characterization of the attorney's conduct, we deferred to that finding because the record reflected a basis for the hearing judge to so conclude. *See Sheridan,* 357 Md. at 29, 741 A.2d at 1158 (noting that the Court was "constrained to accept . . . [the hearing judge's] assessment, particularly given the judge's superior ability to evaluate demeanor-based credibility"). In the instant case, however, we can find no reasonable basis in the record for the hearing judge's conclusion that respondent was not acting dishonestly. Respondent did not put client money into his trust account; he engaged in a deliberate course of misrepresentation in his letters to Dormio's nieces; he took $9,000.00, which he was not entitled to take, and called it a fee; and he misstated the statute of limitations.

Respondent misrepresented the state of his trust account. On July 10, 1997, respondent wrote a letter to Dormio's nieces in which he stated that the entire $18,000.00 was in his trust account. This statement was false. All of the funds were *not* in the account until four days later when respondent transferred half of the money. Respondent's explanation for the delay is not enlightening. He states that because of the passage of time, he cannot recall why the money was not in the account when he wrote the letter.

Respondent also misstated the statute of limitations. In a letter written to Dormio's nieces on June 9, 1999, respondent represented that the insurance company's legal rights had not been extinguished. Respondent testified, however, that he believed his agreement with BC/BS to protect their subrogation interest was subject to a three-year statute of limitations, with the statutory period commencing in February, 1992.

Respondent stated falsely in the same letter to Dormio's nieces that the statute of limitations barred any claim they might have had to the settlement proceeds, even though the statute of limitations was inapplicable. Respondent had a fiduciary obligation to his client to keep that money in trust for the client's benefit. Respondent testified that he regretted writing the June 9, 1999 letter and that it was written "out of anger, frustration because this thing has gone on long enough and let's get it resolved."

Respondent's mishandling of his client's funds was particularly egregious. Respondent's act of disbursing $9,000.00 to himself after having taken one-fourth of the gross settlement proceeds of $25,000.00 went beyond collecting an unreasonable fee. Even if Dormio agreed to split evenly the $18,000.00 with respondent, the agreement was unenforceable and amounts to "fee gouging." Respondent had no legitimate basis for keeping any part of the funds subject to the BC/BS lien. If BC/BS did not assert its subrogation lien, the money belonged to the client, to whom respondent was obliged to disburse the funds.

This Court disbarred an attorney for conduct involving exaction of an unreasonable fee from a client. In *Attorney Grievance Commission v. Kerpelman*, 323 Md. 136, 145, 591 A.2d 516, 521 (1991), the attorney and client agreed that the client would pay $2,500.00 for legal services up to and including the first day of trial and $1,250.00 for each additional day of trial. The attorney estimated that the trial would last three days and agreed to return any unused portion of the fee, but he did not put the fee agreement in writing. *Id.* Before trial, and after the client had paid $5,000.00, the attorney acted abusively toward his client, who then terminated the relationship. *Id.* Although no written agreement existed, the attorney later sent his client a letter claiming that he (the attorney) had "re-examined" the retainer agreement and that it called for an "unrefundable retainer." *Id.* at 146, 591 A.2d at 521. The attorney sent his client another letter in which he misrepresented and inflated the services he had rendered. *Id.* at 146,

591 A.2d at 521–22. In addition to his misconduct regarding the fee, the attorney ignored a clear order from a circuit court judge to refrain from making certain remarks to a jury and acted in a "disruptive and disrespectful manner" during a trial in that judge's courtroom. *Id.* at 142–43, 591 A.2d at 519–20.

We concluded that the attorney violated Rules 1.4(a), 1.5(a), 1.16(a) and (d), 3.5(a)(8), 8.1(a) and (b), 8.2(a), and 8.4(a), (b), (c), and (d). In determining the appropriate sanction, we noted that the attorney had been suspended on two previous occasions for "fee gouging and contumacious conduct." *Id.* at 150, 591 A.2d at 523–24. In disbarring the attorney, we declared that "[b]y his contumacious conduct as an officer of the court and his exaction of an unreasonable fee from a client, he has again revealed his unworthiness to hold himself out to the public as a practitioner of law." *Id.* at 150, 591 A.2d at 524.

Respondent's exaction of an unreasonable fee from his client combined with the trust account violations and misrepresentations lead us to conclude that disbarment is the appropriate sanction. In the instant case, respondent engaged in a "deliberate course of misrepresentation." In addition, respondent collected an unreasonable fee—conduct which we have held to be grounds for disbarment when accompanied by other misconduct. *See Kerpelman,* 323 Md. 136, 591 A.2d 516. Further, respondent, by agreeing to protect the subrogation lien interest of BC/BS in exchange for a $4,500.00 fee, had a conflict of interest between his duties to his client and a self-serving and self-imposed duty to a third party. Compounding the seriousness of these violations, respondent failed to maintain funds in a properly designated trust account—conduct which jeopardizes "the public's confidence in our legal system." Respondent's conduct is the "type of conduct against which the public is entitled to protection, conduct which brings the legal profession into disrepute." *Attorney Grievance Comm'n v. Kerpelman,* 288 Md. 341, 382, 420 A.2d 940, 959 (1980). For all of these reasons, we order that respondent is disbarred.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST JAMES F. BRASKEY.*