*Attorney Grievance Commission of Maryland v. Patrick Guy Samuel Marie Merkle*, Misc. Docket AG No. 17, September Term, 2013. Opinion by Greene, J.

ATTORNEY DISCIPLINE – The hearing judge determined that the attorney involved did not violate the Maryland Lawyers' Rules of Professional Conduct. The findings of fact were not clearly erroneous and the hearing judge did not abuse his discretion in applying the law to the facts as he found them to be. Accordingly, where no rules of professional responsibility were violated, the appropriate outcome, under the circumstances, is dismissal of the Petition for Disciplinary or Remedial Action.

Circuit Court for Prince George's County
Case No. CAE13-15574
Argued: October 6, 2014

IN THE COURT OF APPEALS
OF MARYLAND

Misc. Docket AG No. 17

September Term, 2013
_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

PATRICK GUY SAMUEL MARIE
MERKLE
_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Opinion by Greene, J.
Harrell, Battaglia and Watts, JJ., dissent
_____

Filed: November 24, 2014

On January 23, 2013, the Attorney Grievance Commission of Maryland ("Petitioner"), acting pursuant to Maryland Rule 16-751(a), directed Bar Counsel to file a "Petition for Disciplinary or Remedial Action" against Patrick G. Merkle ("Respondent" or "Merkle"). Petitioner charged Respondent with several violations of the Maryland Lawyers' Rules of Professional Conduct ("MLRPC" or "Rules"), specifically MLRPC 1.1 (Competence),[1] 1.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer),[2] 1.3 (Diligence),[3] 1.4 (Communication),[4] 1.6 (Confidentiality of Information),[5] 7.3 (Direct

---

[1] Under MLRPC 1.1: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

[2] MLRPC 1.2 provides in relevant part:

(a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. . . .
(b) A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.
(c) A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent.

[3] Pursuant to MLRPC 1.3 "[a] lawyer shall act with reasonable diligence and promptness in representing a client."

[4] MLRPC 1.4 provides in pertinent part: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

[5] Under MLRPC 1.6:

(continued...)

Contact with Prospective Clients),[6] and 8.4 (Misconduct).[7]

---

[5](...continued)

(a) A lawyer shall not reveal information relating to representation of a client unless the client gives informed consent, the disclosure is impliedly authorized in order to carry out the representation, or the disclosure is permitted by paragraph (b).

(b) A lawyer may reveal information relating to the representation of a client to the extent that the lawyer reasonably believes necessary:

(1) to prevent reasonably certain death or substantial bodily harm;

(2) to prevent the client from committing a crime or fraud that is reasonably certain to result in substantial injury to the financial interests or property of another and in furtherance of which the client has used or is using the lawyer's services;

(3) to prevent, mitigate, or rectify substantial injury to the financial interests or property of another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud in furtherance of which the client has used the lawyer's services;

(4) to secure legal advice about the lawyer's compliance with these Rules, a court order or other law;

(5) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge, civil claim, or disciplinary complaint against the lawyer based upon conduct in which the client was involved or to respond to allegations in any proceeding concerning the lawyer's representation of the client; or

(6) to comply with these Rules, a court order or other law.

[6]     MLRPC 7.3 provides in relevant part:

(a) A lawyer shall not by in-person, live telephone or real-time electronic contact solicit professional employment from a prospective client when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain, unless the person contacted:

(1) is a lawyer; or

(2) has a family, close personal, or prior professional relationship with the lawyer.

[7]     MLRPC 8.4 provides in pertinent part: "It is professional misconduct for a lawyer to:

(continued...)

# I. Findings of Fact and Conclusions of Law

We referred the instant matter to Judge Herman C. Dawson of the Circuit Court for Prince George's County for an evidentiary hearing and to issue findings of fact and conclusions of law pursuant to Md. Rule 16-757. After conducting a hearing, Judge Dawson issued Findings of Fact and Conclusions of Law, in which he concluded that no violation of MLRPC 1.1, 1.3, 1.4, 7.3, and 8.4 had occurred.[8] In reaching this conclusion, Judge Dawson made the following findings:

## Findings of Fact

Respondent is admitted to the Maryland and District of Columbia Bars. Respondent maintains a law office located at 2120 L. Street, NW, Washington DC. His primary areas of practice include various types of civil litigation matters involving property rights.

Respondent met Sheila Coates-Black[9], the Complainant, in October of 2008 while in the office of the Clerk of the District Court in the Prince George's County Courthouse. While Ms. [Coates] was attempting to fill out

---

(...continued)
(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; [or] . . . (d) engage in conduct that is prejudicial to the administration of justice[.]"

[8] Although the Petition for Disciplinary or Remedial Action charged Respondent with violations of MLRPC 1.2 and 1.6, and Bar Counsel argued before the hearing judge that Rules 1.2 and 1.6 were violated, neither charge was specifically addressed by the hearing judge in his Findings of Fact and Conclusions of Law. Moreover, Bar Counsel has not taken exception to the hearing court's failure to find a violation of MLRPC 1.2 and 1.6. As discussed *infra*, we conclude that no violation of MLRPC 1.2 or 1.6 occurred. *See infra* note 11.

[9] For the purpose of clarity, we will refer to Respondent's client as "Ms. Coates." "Black" was the client's marital surname, which has since been changed following her absolute divorce in 2013.

3

a protective order, the Respondent informed her that she was filling out the form incorrectly. Respondent gave Ms. Coates his business card and informed her that he was an attorney. They began to discuss her possible divorce case as well as a case that he was researching for a personal injury client at Rosaryville Park.

Respondent informed Ms. Coates that he had to visit Rosaryville Park that afternoon. He expressed that he was willing to meet with her further so the two, in separate vehicles, drove to Rosaryville Park. Once at the park, Respondent and Ms. Coates discussed her case further, exchanged telephone numbers, and departed from the park shortly after.

Dating back to the initial meeting in October 2008, the Respondent[] and [Ms.] Coates[] exchanged multiple emails and internet communication prior to executing the two retainer agreements in March 2010. On November 18, 2008, Respondent forwarded Ms. Coates an electronic mail message containing information about a jazz club in the D.C. area. The email stated, "Dear Tahlibah, when I heard that you went to a jazz club, this is what I thought of. I have been on the emailing list for Shore Jazz for years and keep them in mind."

Petitioner introduced an email from Respondent to [Ms.] Coates from December 10, 2008 in which he outlined a proposed course of action which included [Respondent's] statement that [Ms.] Coates should ". . . not hesitate to consult another lawyer, if you are not satisfied with my approach or have any reservations about working with me, including that I might call you when I'm working on your case at 11:00 p.m. . . . I will, of course, defer to your instructions." Petitioner offered no evidence that [Ms.] Coates accepted [Respondent's] offer of representation which was inherently contained in this email.

During 2009, the Respondent and Ms. Coates became friends on Facebook. On August 5, 2009, Ms. Coates posted two pictures to her Facebook page. The first picture contained a message stating, "Erica, Shirrell (Ms. Coates'[s] daughter), myself and Mr. Tolbert (a friend of Ms. Coates) we were at a black tie affair [sic]."

On November 11, 2009 at 10:20 a.m., Respondent posted a message to Ms. Coates'[s] Facebook page claiming, "Maybe that's me on Shirrell's tattoo!" Although Respondent testified that the picture of Mr. Tolbert previously had his name, there was no evidence produced of said posting during this hearing.

On November 11, 2009 at 4:59 p.m., Ms. Coates posted a response to Respondent's message stating, "Funny! Please pardon me I missed that appointment in D.C."

4

On August 5, 2009, Ms. Coates posted a second picture to her Facebook page depicting guests at an "all-white" party. Respondent responded to Ms. Coates'[s] picture, "This looks more like an All-Black Party to me!"

Respondent also posted two other Facebook comments in 2009. Although Respondent claims that his representation of Ms. Coates did not commence until February 2010, Ms. Coates'[s] Facebook page describes a missed appointment in D.C. with Respondent in early November 2009.

While these communications did occur, Respondent testified that the two ceased to communicate on Facebook after the execution of the retainer agreements. Two retainer agreements were signed in March 2010. Respondent's representation of [Ms.] Coates did not commence until they affirmatively executed the two retainer agreements in March 2010 following an escalation of conflict in [Ms.] Coates'[s] divorce matter.

In the months immediately prior to the execution of the retainer agreement, there was a great deal of email traffic between Respondent and Ms. Coates. At one point, [Respondent] invited [Ms.] Coates to stay in a furnished apartment as an escape from the declining relationship between Ms. Coates and her husband. On March 8, 2010, [Respondent] declared in an email, "I can say with confidence that you are at a point where you need representation. We need to schedule an appointment." In this email exchange, [Ms.] Coates stated that she would come in on Wednesday, which was March 10th. Further, [Ms.] Coates conveyed in her email detailed information she had obtained about her husband's preparation for divorce and that he was telling his lawyer that he, [Ms.] Coates's husband, was considering paying her $21,000.00 for [Ms.] Coates to move out and resolve the divorce case in its entirety.

Respondent filed both a divorce action and another civil action alleging libel and slander against [Ms.] Coates's husband, based on the claim that he lied to obtain the protective order he requested on March 5, 2010. Respondent acknowledged that filing the libel suit was risky because a party is largely immunized against making libelous or slanderous statements against another party during litigation. The case was filed as an intentional tort for three reasons: First, he had been very successful in using suits for intentional tort as a way of substantially enhancing financial settlement for clients facing the end of a short-duration marriage who were victims of spousal abuse. Second, since the cause of the breakup of a marriage is only one of many factors for the court to consider in making an award for equitable distribution, Respondent's experience was that spousal abuse is simply not compensated, compared to the potential results of a parallel suit for intentional tort. Third, there was no actual physical contact between [Ms.] Coates and her husband upon which to base a suit for intentional tort. Respondent's emphasis on the underlying facts

5

of the libel and slander case instead of seeking limited divorce based on cruelty was simply a strategy and [Ms.] Coates was fairly informed about the advantages and disadvantages of this strategy.

Respondent finalized the draft of the complaint for divorce during the week of July 2, 2010, which was during his week at Scout camp. He forwarded the complaint to Ms. Coates by email. Ms. Coates filed the divorce case on July 6, 2010 herself and had a third person serve it upon her husband. Respondent contends that there was not a lapse of professional responsibility in having [Ms.] Coates, who was plainly familiar with the process of filing lawsuits, based on the multiple protective order and civil claim filings she filed[,] . . . file and provide for service for her own divorce case.

Petitioner asserted that the Respondent never filed a financial statement that should accompany the complaint for divorce. Counsel for Ms. Coates's former husband, Aubrey Burton, testified that the parties agreed to early mediation. [Mr.] Burton served discovery requests, but only discussed delivery of discovery responses with Respondent after Respondent agreed to vacate the default against [Mr.] Burton's client in May 2011, entered because [Mr.] Burton had not responded to the Court's order of September 24, 2010 by filing an answer for [Mr.] Black. He testified that the case got going on a fast track after the order to vacate default was entered, and corroborated Respondent's testimony that the parties attempted to bifurcate the case and get a divorce hearing on May 24, 2011, reserving equitable distribution until later, but were thwarted in this effort by the hearing Master.

[Mr.] Burton further testified that he did not file a motion to compel discovery. The letter to [Respondent] of November 22, 2010 is not a demand letter required under the discovery rules prior to filing a motion to compel or for discovery sanctions. It simply states that [Mr.] Burton will "provide your client with discovery materials once your client complies with his Interrogatories and Request for Production of Documents. Please notify me of when your client intends to provide responses to Mr. Black's discovery responses (sic)."

Respondent referred to Ms. Coates as a "high maintenance" client. Because of the high level of attention that Ms. Coates demanded, Respondent assigned the task of dealing with her to his legal assistant, Kay Feegle. Ms. Feegle assisted Ms. Coates with the preparation of her discovery requests.

On July 7, 2011, Ms. Coates testified during the *pendente lite* hearing before Master Paul Eason in the Circuit Court. Respondent called Ms. Coates as a witness and asked her questions about her income. Respondent did not introduce documentation of Ms. Coates'[s] medical bills. He also did not introduce any evidence to corroborate her income during the hearing.

6

Respondent did not call Mr. Black to the stand or demonstrate that Mr. Black had the ability to pay temporary alimony using documentation he received earlier in the year from Ms. Coates. Master Eas[]on denied Ms. Coates'[s] request for *pendente lite* alimony for insufficient evidence. After the hearing, Ms. Coates, Mr. Black, Mr. Burton and Respondent met in the courthouse to discuss how Ms. Coates would obtain portions of her personal belongings from the marital home.

Although Respondent testified that Ms. Coates requested his assistance in moving items from the marital home, both Mr. Burton and Ms. Coates testified that Respondent offered to move Ms. Coates'[s] personal belongings. Mr. Burton testified that Respondent suggested that he would move Ms. Coates'[s] items using his Suburban truck. Respondent testified that [Ms.] Coates carried a few handheld items into her residence herself, but that he was the one who did the bulk of the unloading from her car.

Respondent testified that by the time he was finished unloading [Ms.] Coates's car, he had a blinding headache. He attributed it to a combination of two factors, heat and stress. The stress was associated with [Ms.] Coates's failure at the *pendente lite* hearing despite her promises the night before that she knew how to answer all the financial questions, her misbehavior at [Mr.] Black's house, and her unnecessarily long route drive to her apartment.

Respondent testified that he told [Ms.] Coates of his blinding headache and that, upon request, she provided him with four Advil gelcaps, which he stated was the same sort of headache medicine that he used. He testified that he told [Ms.] Coates that he was going to sit in his vehicle with the air conditioning running until his headache subsided enough that he could drive away. Respondent testified that [Ms.] Coates told him that he should stay inside her apartment, but the only available space to sit, other than the stools in the kitchen, was half of her queen bed. Every available space on sofas, chairs and half of her mattress were occupied with boxes, papers and other items left where they'd been placed when she moved in during May. Respondent testified that he accepted her invitation and laid down on her bed for about 20 minutes before leaving. He testified that she was on the phone during this time, and that he handled a call as well. Respondent did not make any inappropriate comments or gestures towards Ms. Coates.

Respondent did not file exceptions to Master Eas[]on's recommendation denying Ms. Coates *pendent[e] lite* alimony. Ms. Coates testified that she could meet her expenses at the hearing, and had presented [Respondent] with a financial statement consistent with her testimony. Respondent argued that he intentionally omitted introducing any further evidence from the hearing regarding [Ms.] Coates's medical condition because

7

it would address equitable distribution, not [Ms.] Coates's financial need as of July 7, 2011, and would show h[is] hand prematurely to the opposition. Respondent testifie[d] that he had a plan as to how he wanted Ms. Coates'[s] case to proceed and he did not want to tip his hand at the *pendente lite* hearing.

On or about September 14, 2011, Ms. Coates informed Respondent that she was terminating his representation. After being informed of his termination, Respondent attempted on various occasions to inquire about the reasons for termination and the steps needed to be taken by Ms. Coates moving forward. Respondent filed a Motion to Strike Appearance on October 12, 2011. On October 18, 2011, Respondent was stricken from the case by the court.

The first divorce case where Respondent represented Ms. Coates was dismissed. The second divorce case was resolved by Ms. Coates's former husband agreeing to pay [Ms.] Coates $600.00 in alimony for four years, with an initial alimony payment of $1,000.00, for a total of $29,200.00. [Mr.] Burton testified that the impetus for this settlement was [Ms.] Coates's disability arising from surgery in 2012, after [Respondent] was off the case.

Judge Dawson further entered conclusions of law, concluding that Mr. Merkle had not violated MLRPC 1.1, 1.3, 1.4, 7.3, and 8.4. He explained:

**Conclusions of Law**

* * * *

A.      **[MLRPC] Rule 1.1 – Competence**

* * * *

1.      Bar Counsel alleges a lack of competence. Respondent demonstrated a creative and unique approach to maximizing the value of an equitable distribution case, which is what his representation of Coates involved, at its essence. The issues regarding the financial statements do not suggest a lack of competence; rather, they reflect the fact that the case went through periods of defendant's protracted default, Coates's own relocation without informing her counsel (and the substantial reduction in her housing cost estimate which resulted), and, in the end, Coates's reporting that she was actually living within her means.

2.      Bar Counsel stresses that Respondent allowed Coates to file documents

8

on her own behalf, but fails to note that Coates continued to file her own protective order cases against her husband, without telling Respondent, during the pendency of her divorce case. She even filed a default motion against Black on her own, without telling her lawyer and certainly not at his request. Coates was competent at filing documents in the clerk's office, so it was reasonable for her to assist in her own case in this way.

3.  Bar Counsel seeks to interpose its own judgment that Respondent filed the libel and slander case without a good faith basis, although no judge has ever even considered this. Certainly, Coates's statement that her husband had lied extensively to obtain a protective order, resulting in significant inconvenience to her, was reasonably relied upon by Respondent in drafting that complaint. The fact that this would reasonably have been argued to comprise a claim for extreme cruelty as grounds for limited divorce has not been considered by Bar Counsel. Based on Respondent's experience in using intentional tort cases as leverage in equitable distribution cases involving marriages of short duration, this attempt to leverage the cruelty for what it was – false statements designed to hurt Coates – was well within a good faith basis, regardless of the outcome.

4.  Bar Counsel claims that the libel and slander case was dismissed for failure to state a cause of action; however, there was no evidence provided at the hearing to support that.

**B.  [MLRPC] Rule 1.3 – Diligence**

\* \* \* \*

5.  Bar Counsel alleges a lack of reasonable diligence and promptness on Respondent's part in connection with his response to discovery propounded by opposing counsel. Here, Bar Counsel, rather than Mr. Burton who was opposing trial counsel in the divorce matter, is asserting a discovery violation for a default in providing discovery. In the absence of any intervention by the Court in this regard, no motion was filed prior to Respondent's termination by Coates, and in particular considering the fact that opposing counsel had disappeared for months and was in default in May 2011, this Court is not going to regard Respondent's efforts regarding discovery as too little, too late. He finalized the interrogatories and provided Coates with the tools to assist in responding to [a] request for production of documents, and was in agreement with opposing counsel to supply discovery in time for the September 28, 2011 mediation when Coates terminated his role in the case.

9

**C.    [MLRPC] Rule 1.4(b) – Communication**

\* \* \* \*

6.    Bar Counsel alleges that Respondent failed to explain Ms. Coates's matter to her sufficiently for her to make informed decisions regarding the representation.   Bar Counsel fails to show how Coates was denied the opportunity to weigh in on any decisions affecting the case or regarding the representation which were impacted by this allegation.  Respondent testified that Coates was a "high maintenance" client.  The sheer volume of email traffic between Respondent and Coates reveals the fact that he not only responded to her inquiries, he consistently provided information to her about the strategy of the case.  Respondent testified that he was well prepared with Coates's medical information for the May 24, 2011 merits hearing which was cancelled.  The response to interrogatory No. 2 reveals that Respondent was aware of at least four physicians and was prepared to submit reports from each of them in respect of Ms. Coates's physical and emotional condition.  Bar Counsel requests that the Court speculate regarding whether Mr. Burton might have taken a different approach to settlement of the case "had he been aware of Ms. Coates's medical condition."  In the same paragraph, Bar Counsel notes that "Mr. Burton testified that her back injuries had been a factor throughout the marriage . . ."  The Court finds that Burton was aware of the medical ailments that Ms. Coates suffered during the time that Respondent represented her.

7.    Bar Counsel points to emails from Coates to Respondent during Mr. Burton's hiatus from the case as evidence that Respondent was deficient in his responsiveness to his own client, or putting her case on hold.  Under the circumstances of this case, it cannot fairly be claimed that Respondent was dilatory in the progress of the case.  In fact, but for Respondent obtaining an order for default, there's no telling how long the case might have languished. Importantly, Coates was residing in the same house as her estranged husband, and undoubtedly felt pressure from this.  However, the client was not experiencing issues because of not being kept informed about the case by Respondent.

**D.    [MLRPC] Rule 7.3 – Direct Contact with Prospective Clients**

\* \* \* \*

8.    Bar Counsel argues that Respondent's communications with Coates following their informal meeting is akin to a cold call by a lawyer initiating

contact with train crash victims in their hotel where they were placed following the accident. Respondent testified that he declined to represent Coates at the outset of their communication, stating that she had no grounds for a case yet. Two months later, when he provided a suggested outline of his strategy for representation, he also advised Coates to consult other counsel as well. It was clear that he intended that she would have no obligation to him whatsoever if she didn't like his approach to solving her situation. After providing a suggested course of action, Respondent did not contact Ms. Coates again until she contacted him through social media or when she contacted him when the police were at her door seeking to arrest her.[10] Plainly, from the very beginning of their communication, Respondent simply became a person known to Coates who was a lawyer, who was accessible to her by phone and email, and with whom she could discuss her situation with no obligation on either party's part.

E.      [MLRPC] Rule 8.4 – Misconduct

* * * *

9.      The Court declines to find that Respondent's conduct was prejudicial to the administration of justice. Bar Counsel did not introduce any evidence of Coates's mental state at the hearing, yet argued in her closing that Coates was a vulnerable individual who Respondent took advantage of. Certainly Respondent did not obtain any financial advantage from Coates, who was never in a position to pay for the legal services he provided.

10.     The Court finds that Respondent's initial representation of Coates did not occur until March 10, 2010, when the parties executed the first retainer agreement. Until that time, as the Court has previously stated, Respondent was available as a contact to Coates, but not actually engaged in her behalf until the parties met and formalized the scope of work Respondent would undertake for Coates. Coates had the opportunity to formally engage Respondent on terms he outlined to her on December 10, 2008; however, she did not act upon that. The Court credits Respondent's testimony and not Bar Counsel's argument to the contrary, that Respondent declined to represent Coates in October 2008. Bar Counsel makes much ado regarding Respondent giving his business card

---

[10]      Ms. Coates's former husband, Mr. Black, obtained a temporary protective order against Ms. Coates. According to Ms. Coates's testimony before the hearing court, Ms. Coates was served with the order and asked to surrender a handgun and move out of the marital residence. The court subsequently dismissed the order on Mr. Black's request.

11

to Coates. The Court takes notice that many lawyers would provide their business cards as a matter of course to persons in introduction. After Coates then declined to retain Respondent, as the Court has stated, Respondent was willing to make himself available to answer Coates's phone calls and emails and, as her domestic situation escalated, Respondent agreed to represent her about 15 months later.

11.    Bar Counsel appears to argue that Respondent established an attorney-client relationship with Coates either by handing him his business card or sending her an email outlining his proposed strategy for her case. That would [mean] that even talking to a lawyer creates an attorney-client relationship, or that if a client declines to hire the lawyer according to the work outlined, an attorney-client relationship has been established. That is hard to accept as true. It would eliminate the public's ability to even approach lawyers for informal conversation, and lawyers would stop handing out business cards and making proposals based on issues presented to them by prospective clients. Such a rule would be far more detrimental to the administration of justice than anything presented to the Court in hearing of this grievance.

12.    Bar Counsel faults Respondent for staying in touch with Coates after she terminated his services, to the point, Bar Counsel claims, of harassing her. That simply cannot be shown from this record. Respondent necessarily requested advice from Coates regarding referral of her case file to new counsel. Respondent testified that he did not protest his representation being terminated, but that he was concerned that there be an orderly transition to substitute counsel. There was no such transition, and Coates represented herself for some time.

Finding no violation, the hearing judge recommended that we dismiss the instant matter. Petitioner excepts to the hearing judge's (1) conclusion of law that no violation of MLRPC 7.3(a) occurred, (2) failure to find that Ms. Coates was emotionally vulnerable at the time of her interaction with Respondent, and (3) conclusion of law that no violation of MLRPC 8.4(d) occurred. Petitioner recommends that Respondent be reprimanded, if this Court determines that Respondent violated MLRPC 7.3(a) only, or, alternatively, that Respondent be suspended for thirty days, if this Court determines that Respondent violated

12

MLRPC 8.4(d). Respondent takes no exceptions to the hearing judge's findings.

## II. Discussion

## A. Standard of Review

In attorney discipline proceedings, "this Court has original and complete jurisdiction and conducts an independent review of the record . . . [T]he hearing judge's findings of fact generally will be accepted unless they are clearly erroneous." *Attorney Grievance Comm'n v. Cherry-Mahoi*, 388 Md. 124, 152, 879 A.2d 58, 76 (2005) (citations omitted). In making his or her findings of fact, "[t]he hearing judge is permitted to 'pick and choose which evidence to rely upon' from [the] conflicting array [of facts presented]." *Attorney Grievance Comm'n v. Guida*, 391 Md. 33, 50, 891 A.2d 1085, 1095 (2006) (quoting *Attorney Grievance Comm'n v. Fezell*, 361 Md. 234, 253, 760 A.2d 1108, 1118 (2000)). Moreover, "the hearing judge is not required to recount all of the evidence presented at the hearing." *Attorney Grievance Comm'n v. Link*, 380 Md. 405, 421, 844 A.2d 1197, 1207 (2004) (quoting *Attorney Grievance Comm'n v. Braskey*, 378 Md. 425, 446, 836 A.2d 605, 618 (2003)). "This deference accorded to the hearing judge's findings is appropriate, in part, because the fact finder is in the best position to assess the demeanor-based credibility of a witness." *Attorney Grievance Comm'n v. Edib*, 415 Md. 696, 707, 4 A.3d 957, 964 (2010) (citations omitted). Under Maryland Rule 16-759(b)(2)(B), "[i]f exceptions are filed, the Court [] shall determine whether the findings of fact have been proven by [clear and convincing evidence by the Petitioner]." Or put differently, this Court will not disturb the hearing judge's factual

13

findings if they are based on clear and convincing evidence. *Attorney Grievance Comm'n v. Stolarz*, 379 Md. 387, 397, 842 A.2d 42, 47 (2004).

The hearing judge's proposed conclusions of law are reviewed for legal correctness. *Attorney Grievance Comm'n v. West*, 378 Md. 395, 410, 836 A.2d 588, 596 (2003). "In other words, the ultimate determination . . . as to an attorney's alleged misconduct is reserved for this Court." *Attorney Grievance Comm'n v. De La Paz*, 418 Md. 534, 552, 16 A.3d 181, 192 (2011) (citation omitted). Having reviewed Judge Dawson's findings, we agree that Respondent has committed no violation of MLRPC 1.1, 1.3, 1.4, 7.3, and 8.4. We conclude that Petitioner did not satisfy its burden of persuasion with regard to the alleged violations.[11]

---

[11] As noted above, the hearing judge made no specific findings of fact or conclusions of law with respect to MLRPC 1.2 and 1.6. Bar Counsel has not directed this Court to any evidence in the record, including findings of fact, that would support a violation of MLRPC 1.2 or 1.6. In addition, based upon our independent review of the record, including the findings of facts, we find no basis to sustain these charges.

Petitioner argued, in her opening statement before the hearing court, that Respondent violated MLRPC 1.2 by "allow[ing] Ms. Coates to file her own pleadings, affidavits, and to complete her own financial statement mainly without the support of counsel[.]" Hearing Transcript, vol. I, at 6:3-6:8. Apart from this conclusory statement, Bar Counsel did not explain, in the Petition for Disciplinary or Remedial Action, at the disciplinary hearing, or in Petitioner's Exceptions, exactly how this conduct violated MLRPC 1.2(a). The hearing judge found that Ms. Coates was "plainly familiar with the process of filing lawsuits." This finding would not support a legal conclusion that Merkle violated Rule 1.2.

Petitioner also argued in her opening statement before the hearing court that Respondent violated MLRPC 1.6 by including confidential information without Ms. Coates's consent in his Motion to Strike Appearance. Hearing Transcript, vol. I, 8:2-8:5. Bar Counsel argued in her closing that "Rule 1.6 is violated when [Respondent] filed Ms. Coates's complaint with our office, and as the Court's views dessert Rule 16-723(b) [sic]. . . Counsel cannot use Bar Counsel's investigation in a public proceeding." Hearing Transcript, vol. II, 65:14-65:20. Absent any evidence or explanation elsewhere in the record as to how

(continued...)

## B.       MLRPC 7.3(a)

Petitioner first excepts to the hearing judge's conclusion of law that Respondent committed no violation of MLRPC 7.3(a). Under the Rule "[a] lawyer shall not by in-person, live telephone or real-time electronic contact solicit professional employment from a prospective client when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain[.]" The purpose of prohibiting in-person solicitation is contained in the Commentary to the Rule, which states:

> [1] There is a potential for abuse inherent in direct in-person, live telephone or real-time electronic contact by a lawyer with a prospective client known to need legal services. These forms of contact between a lawyer and a prospective client subject the layperson to the private importuning of the trained advocate in a direct interpersonal encounter. The prospective client, who may already feel overwhelmed by the circumstances giving rise to the need for legal services, may find it difficult fully to evaluate all available alternatives with reasoned judgment and appropriate self-interest in the face of the lawyer's presence and insistence upon being retained immediately. The situation is fraught with the possibility of undue influence, intimidation, and over-reaching.

Petitioner contends that Respondent's initial interaction with Ms. Coates went beyond that of an ordinary social introduction, as characterized by the hearing judge. Rather, Bar Counsel avers that Respondent's contact with Ms. Coates evinced a motive to (1) solicit Ms. Coates as a client in order to gain a monetary benefit, and (2) develop a personal relationship

---

[11](...continued)
Respondent violated MLRPC 1.6, we do not interpret Bar Counsel's conclusory argument to be evidence of a violation. Accordingly, we have no basis for declaring that Mr. Merkle violated MLRPC 1.6.

15

with Ms. Coates.[12]  As discussed below, we agree with the hearing judge's conclusion that Respondent was neither attempting to solicit representation nor motivated by monetary gain.

Although Respondent initiated a conversation with Ms. Coates, informed Ms. Coates that he was an attorney, handed her his business card, discussed her case, and the two exchanged telephone numbers, Petitioner has failed to show, clearly and convincingly, that Respondent's motive in doing so was for pecuniary gain.  Indeed, the hearing judge found that Respondent declined to represent Ms. Coates in October 2008, when the two first met. That Respondent sent Ms. Coates an email two months later in which he detailed a case strategy does not indicate clearly that he was attempting to solicit business from Ms. Coates when the two individuals met.  Moreover, Respondent and Ms. Coates did not enter into a retainer agreement until fifteen months after meeting in-person.  The hearing judge made no finding that the circumstances were overwhelming or unduly influential for Ms. Coates. Respondent's conduct appears to have arisen from his desire to provide Ms. Coates with information, as opposed to a desire to represent her.  Where an attorney refuses initially to represent the prospective client, does not insist that he be retained immediately, and the circumstances do not indicate that the prospective client felt undue pressure to seek representation, the facts do not support the conclusion that MLRPC 7.3(a) has been violated.

---

[12]     The motive to develop a personal relationship with Ms. Coates, although important to Bar Counsel's arguments elsewhere, has little bearing on whether Respondent violated MLRPC 7.3(a).  The prohibition on in-person solicitation considers whether the lawyer's motive was pecuniary, not romantic, gain.

Bar Counsel points to several cases, relying principally on *Attorney Grievance Comm'n v. Franz*, 355 Md. 752, 736 A.2d 339 (1999), in addition to *Attorney Grievance Comm'n v. Gregory*, 311 Md. 522, 536 A.2d 646 (1988) and *Attorney Grievance Comm'n v. Weiss*, 300 Md. 306, 477 A.2d 1190 (1984), in support of its position. In *Franz*, this Court upheld the hearing judge's conclusion that the respondents, Keith Franz and Judson Lipowitz, violated MLRPC 7.3(a) by actively seeking out victims of a train accident immediately after the incident. 355 Md. at 756-58, 736 A.2d at 341-42. The respondents spoke by telephone shortly after learning about a train accident near Silver Spring, Maryland. 355 Md. at 756, 736 A.2d at 341. They decided to travel to a hotel, which had been established as a headquarters by the railroad companies following the collision, in order to investigate the accident. *Id.* While at the hotel, respondents initiated contact with several victims. *Id.* Respondents informed the victims that they were attorneys and handed out business cards, telling some victims that they wished to represent them. *Id.* Respondents did not bring retainer agreements with them and advised the victims to consult with others before making a decision as to any representation. *Id.* The respondents subsequently made follow-up telephone calls and in-person visits to the prospective clients, some of which ultimately decided to retain respondents. *Id.* After being retained by some of the victims, respondents determined that their conduct was improper and self-reported to the Attorney Grievance Commission, accepting responsibility for their violations of MLRPC 7.3(a) among other things. 355 Md. at 757, 736 A.2d at 341.

17

We find Bar Counsel's reliance on *Franz* in the instant case to be misplaced. Petitioner attempts to drawn an analogy by noting that, similar to *Franz*, Mr. Merkle initiated contact with Ms. Coates in-person, there was a delay in signing the retainer agreements, and Ms. Coates was given the opportunity to decline Respondent's representation. Unlike the attorneys in *Franz*, however, there is no indication that Mr. Merkle went to the courthouse for the purpose of soliciting potential clients. Bar Counsel points out that Respondent sent Ms. Coates a proposed course of action, in which he also advised her to consult other attorneys some two months after meeting her. The hearing judge found, however, that Respondent did not communicate with Ms. Coates again until she contacted him through email and Facebook or when she contacted Respondent after police arrived at her residence to enforce a protective order.[13] Moreover, there is no indication that the circumstances surrounding Respondent's interaction with Ms. Coates presented the same concern for potential abuse or undue influence as there was in *Franz*. Indeed, the attorneys' conduct in *Franz* gave rise to such concerns because the ability of the victims of a train collision, which killed and injured multiple passengers, to evaluate the desirability of retaining counsel was particularly susceptible to improper influence in the face of an attorney's insistence that he be retained.[14] In our view, soliciting individuals immediately following a catastrophic event

---

[13]  *See supra* note 10.

[14]  The conduct of several attorneys following the 1996 train collision in Silver Spring, Md., drew sharp criticism from the public. *See* Mark Hyman and Sandy Banisky, *Lawyers Sniff Out Victims; Train Crash: Soliciting Business After the Silver Spring Marc-Amtrak*

(continued...)

18

does not present the same concerns as does the interaction between an attorney and a potential client in the instant case. Nor is there a similarity between intentionally traveling to the scene of an accident for the purpose of soliciting business, as in *Franz*, and offering advice to an individual who happened to be in the courthouse at the same time, but declining any representation, as in the present case.

This Court is likewise unpersuaded by Petitioner's reference to *Gregory* and *Weiss*. In *Attorney Grievance Comm'n v. Gregory*, 311 Md. 522, 536 A.2d 646 (1988), the attorney's practice of introducing himself as an attorney and handing out letters soliciting business to defendants outside the courtroom after the defendants had just been advised of their right to counsel was held to constitute a clear violation of the ethical restrictions imposed on in-person solicitation. Similarly, in *Attorney Grievance Comm'n v. Weiss*, 300 Md. 306, 477 A.2d 1190 (1984), this Court upheld the hearing judge's determination that the attorney improperly solicited clients by, among other things, waiting in the back of the courtroom and speaking with prospective clients regarding representation as they were leaving the courtroom. What pervades all three cases cited to by Petitioner is the attorneys' efforts to actively seek out clients. In the instant matter, there is no indication that

---

[14](...continued)
*Train Collision, Aggressive Lawyers Intruded on the Grief of Families. Some of their Subsequent Actions May Violate Rules of Professional Conduct*, Balt. Sun, March 13, 1996, at 1A. Indeed, this is the very conduct–which not only severely damages the public's perception of attorneys, but more importantly has the potential to harm members of the public–that MLRPC 7.3(a) aims to prevent.

Respondent's intent was to solicit Ms. Coates, or any other individual in the courthouse, for representation. Rather, as the hearing judge found, this appears to be a situation in which there was no expectation or obligation of representation at the outset.

## C.     Factual Exception

Petitioner has taken exception to the hearing judge's finding that Bar Counsel failed to produce evidence regarding Ms. Coates's mental state. Bar Counsel asks this Court to conclude that Ms. Coates was in a vulnerable state, pointing to testimony adduced at the hearing in the Circuit Court and emails exchanged between the Respondent and Ms. Coates.

As explained above, we ordinarily accept the hearing judge's findings of fact unless they are clearly erroneous. *Attorney Grievance Comm'n v. Cherry-Mahoi*, 388 Md. 124, 152, 879 A.2d 58, 76 (2005) (citations omitted). "The rationale behind the clearly erroneous standard is settled. The trial judge is physically present during the testimony and is able to observe matters not usually reflected in a cold record, such as the demeanor and credibility of witnesses." *In re Anthony W.*, 388 Md. 251, 278, 879 A.2d 717, 733(2005). In applying the "clearly erroneous" standard, "[i]f there is any competent evidence to support the factual findings below, those findings cannot be held to be clearly erroneous." *Washington v. State*, 424 Md. 632, 651, 37 A.3d 932, 942 (2012). The hearing judge "is permitted to 'pick and choose which evidence to rely upon' from a conflicting array" when making his or her findings. *Guida*, 391 Md. at 50, 891 A.2d at 1095 (quoting *Fezell*, 361 Md. at 253, 760 A.2d

at 1118). Importantly, "the hearing judge is not required to recount all of the evidence presented at the hearing." *Attorney Grievance Comm'n v. Link*, 380 Md. 405, 421, 844 A.2d 1197, 1207 (2004) (quoting *Attorney Grievance Comm'n v. Braskey*, 378 Md. 425, 446, 836 A.2d 605, 618 (2003)); *see Attorney Grievance Comm'n v. Granger*, 374 Md. 438, 453, 823 A.2d 611, 620 (2003). "The [hearing judge] is not only the judge of a witness's credibility, but is also the judge of the weight to be attached to the evidence." *In re Anthony W.*, 388 Md. at 279, 879 A.2d at 733 (quoting *$3,417.46 U.S. Money v. Kinnamon*, 326 Md. 141, 149, 604 A.2d 64, 67-68 (1992)). This decision is left to the discretion of the hearing judge precisely because it depends, to a great extent, on assessing the credibility of the witnesses. Md. Rule 16-759(b)(2)(B) (We "shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses.").

In support of its argument, Petitioner directs this Court to the following testimony from Ms. Coates, adduced before the hearing court:

> Q: You were in an emotionally abusive arrangement staying at [your marital home], right?
>
> A: Sometimes.
>
> * * * *
>
> Q: Ms. Coates, why did you file the protective orders against your husband?
>
> A: We had been going back and forth. Either we were going to get back together – it was just back and forth, back and forth.
>
> * * * *

21

> A:     Because I was afraid.  He became so abusive.  We were going
>         back and forth.

Bar Counsel also cites to Respondent's testimony before Judge Dawson, namely his response that "I have a pretty good deal of experience somewhere on the order of 15 cases involving short duration marriages with, I want to say, violence[,] but Ms. Coates-Black, her violence is really emotional violence, this back and forth stuff with the TPOs[.]"  Bar Counsel notes lastly that several emails exchanged between Ms. Coates and Mr. Merkle reference Ms. Coates's emotional situation.

The hearing judge's findings of fact are not clearly erroneous.[15]  The hearing judge, in reaching his conclusion that no violation of MLRPC 8.4(d) occurred, noted that "Bar Counsel did not introduce any evidence of [Ms.] Coates's mental state at the hearing, yet argued in her closing that [Ms.] Coates was a vulnerable individual who Respondent took advantage of."  The testimony and emails offered into evidence during the disciplinary hearing in the Circuit Court were among the "conflicting array" of evidence, which the hearing judge assessed.  Ultimately, however, the hearing judge did not find this evidence, which represented only a fraction of the entirety of the record presented to the hearing judge, to clearly and convincingly indicate that Ms. Coates suffered from a particularly vulnerable state, mentally or physically.  To say that Ms. Coates was "afraid" or that her husband "became so abusive" without more details, context or explanation does not constitute clear

---

[15]     To be sure, Bar Counsel does not explicitly state that the hearing judge's findings are clearly erroneous.

and convincing evidence of Ms. Coates's mental state or their marital discord. Bar Counsel directs us to conclusory statements and unsubstantiated claims upon which we are asked to make demeanor-based, factual inferences. Ms. Coates's and Mr. Merkle's conclusory statements, without some corroborating evidence, are insufficient to establish the extent to which Ms. Coates was vulnerable under the circumstances.[16] Moreover, the evidence is not enough to show that the hearing judge's findings of fact were clearly erroneous. Therefore we decline the invitation to substitute our own judgment for the hearing judge's assessment of the evidence regarding Ms. Coates's mental state.

In any event, even if Bar Counsel had effectively presented evidence sufficient to establish Ms. Coates's mental state, as discussed *infra*, Petitioner has failed to show that Mr. Merkle took advantage of, or "preyed on," this purported fragility in an effort to develop a romantic relationship with Ms. Coates. In other words, sustaining Petitioner's factual exception would have no bearing on this Court's legal conclusions.

### D.    MLRPC 8.4(d)

Bar Counsel has taken exception to the hearing judge's conclusion of law that Respondent did not violate MLRPC 8.4(d). The gravamen of Petitioner's exception is that Respondent's conduct is indicative of his misuse of the attorney-client relationship in an

---

[16]    To be clear, we are making no comment as to whether Ms. Coates *could have been* in a vulnerable mental state. Rather, we are sustaining the hearing judge's conclusion regarding the sufficiency of the evidence presented.

effort to develop a sexual relationship with Ms. Coates. We overrule Petitioner's exception noting (1) Bar Counsel's reliance on facts not contained within the hearing judge's findings, and (2) the lack of evidence to support an MLRPC 8.4(d) violation.

To bolster the contention that Respondent sought to develop a romantic relationship with Ms. Coates, Petitioner relies on several alleged interactions between Respondent and Ms. Coates, specifically: (1) Facebook communications; (2) Respondent's offers to have Ms. Coates use his rental property; (3) Respondent's unexpected, late-night visit to Ms. Coates's home; (4) Respondent's request for a back massage; (5) Respondent's comments about Ms. Coates's attire; (6) Respondent's offer to help Ms. Coates move out of her marital home; and (7) Respondent's lying on Ms. Coates's bed following the move–which Bar Counsel refers to as "the culmination of months of his subtle prodding to become closer to [Ms. Coates]." Petitioner avers that each of these instances are supported by evidence contained in the record below, however, many of the allegations upon which Bar Counsel relies were not established as true by the hearing judge. Moreover, many of the allegations Bar Counsel relied upon, both before this Court and before the hearing judge, were in dispute. With regard to the allegations not in dispute, Bar Counsel failed to demonstrate how those facts were indicative of Respondent's attempt to develop an improper, romantic relationship with Ms. Coates.[17] As discussed above, this Court does not serve as a fact finder and we are not

---

[17]     For example, although Respondent offered Ms. Coates the use of his rental property, the evidence does not suggest that Respondent's intent was that the two would stay there

(continued...)

24

in a position to weigh the credibility of the witnesses in order to determine, for instance, whether to credit Respondent's or Ms. Coates's conflicting testimony regarding an alleged massage request. Further, we will not substitute our judgment for that of the fact finder, to overrule, for instance, the hearing court's findings regarding the circumstances of Respondent's laying down following Ms. Coates's move–namely that Ms. Coates told him he could rest inside due to his headache–in order to credit Bar Counsel's interpretation of the event–that this was "the culmination of months of [Respondent's] subtle prodding to become closer to [Ms. Coates]." Bar Counsel does not contend that the hearing judge's findings of fact were clearly erroneous. To the contrary, the contention is essentially that the hearing judge made the wrong factual findings or that the hearing judge did not include enough facts in his findings. Accordingly, to the extent that Petitioner's exception with respect to MLRPC 8.4(d) relies on facts not determined by the hearing judge, Petitioner's exception is overruled.

Upon review of the hearing judge's findings, this Court concludes that there is insufficient evidence to establish a violation of MLRPC 8.4(d). "In general, an attorney violates M[L]RPC 8.4(d) when his or her conduct impacts negatively the public's perception or efficacy of the courts or legal profession." *Attorney Grievance Comm'n v. Rand*, 411 Md. 83, 96, 981 A.2d 1234, 1242 (2009). "An attorney's conduct rises to this level if it is so egregious that it has a negative impact on the profession as a whole, leaving a bad mark on

[17](...continued)
together as opposed to having Ms. Coates stay there alone.

25

all of us." *Attorney Grievance Comm'n v. Dore*, 433 Md. 685, 709-10, 73 A.3d 161, 177 (2013). The hearing judge did not find that Respondent was attempting to misuse his role as Ms. Coates's attorney in order to develop a sexual relationship with her. The failure to find an improper motive on the part of Mr. Merkle on the basis of the evidence presented was not, in our view, clearly erroneous. Specifically, the hearing judge found that Respondent and Ms. Coates communicated on Facebook and by email, but the comments between them on Facebook ceased after they entered into an attorney-client relationship. The hearing judge also found that Respondent invited Ms. Coates to use his furnished apartment as a place to reside and for the reasons explained by Respondent. In addition, the hearing judge found that Respondent offered to assist Ms. Coates in moving her personal belongings to a new location, and that Respondent did physically help her in making the move. Finally, the hearing judge accepted Mr. Merkle's explanation for lying down on Ms. Coates's bed. Judge Dawson determined that Mr. Merkle made no inappropriate comments or gestures toward Ms. Coates during this interaction. Although the interactions between Ms. Coates and Respondent may have been outside of the traditional attorney-client relationship, Respondent's conduct did not rise to the level of a violation of MLRPC 8.4(d).

The Preamble to the Maryland Lawyers' Rules of Professional Conduct provides, in relevant part, that "[m]any of a lawyer's professional responsibilities are prescribed in the Maryland Lawyers' Rules of Professional Conduct, as well as substantive and procedural law. However, a lawyer is also guided by personal conscience and the approbation of

26

professional peers." Comment [7]. As to the scope of these Rules, the Preamble also provides in relevant part:

> [The Rules] are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself. Some of the Rules are imperatives, cast in the terms "shall" or "shall not." These define proper conduct for purposes of professional discipline. Others, generally cast in the term "may," are permissive and define areas under the Rules in which the lawyer has discretion to exercise professional judgment. No disciplinary action should be taken when the lawyer chooses not to act or acts within the bounds of such discretion.

Comment [14]. Accordingly, a lawyer has discretion to communicate with clients or prospective clients through social media. Likewise, assisting or offering to assist a client or prospective client in obtaining shelter or in moving from one residence to another is not per se violative of the Maryland Lawyers' Rules of Professional Conduct. Whether or not the attorney violates the Rules of Professional Responsibility will depend upon the facts and circumstances of each case. When a lawyer, in the exercise of discretion, involves him or herself in conduct that is unnecessary to the attorney-client relationship or exceeds the bounds of the attorney-client relationship, however, he or she runs the risk that his or her exercise of professional judgment may be found to be both unreasonable and subject to the disciplinary process.[18]

---

[18] To be sure, we do not suggest that social networking sites such as Facebook ought to be avoided by attorneys outright. Indeed, attorneys may find them useful as networking tools. Attorneys should exercise caution and be guided by professionalism when contacting clients or prospective clients through the internet, however, recognizing that any communication is both permanent and public.

27

We are unpersuaded by Bar Counsel's reference to *Attorney Grievance Comm'n v. Goldsborough*, 330 Md. 342, 348, 624 A.2d 503, 505 (1993)–in which an attorney, among other things, pulled his client "across his knee, and . . . spanked her lightly several times," after calling her a "bad girl"–finding the case wholly distinguishable.[19] Nor is this Court convinced that *Attorney Grievance Comm'n v. Hall*, 408 Md. 306, 330-32, 969 A.2d 953, 967-68 (2009) (attorney found to be in violation of MLRPC 8.4(d) for having a sexual relationship with his emotionally fragile client during his representation of her in an employment discrimination suit), is pertinent. In the present case, Bar Counsel did not establish that Mr. Merkle and Ms. Coates had a sexual relationship or that Mr. Merkle attempted to establish one. On the basis of the record before us, we are unable to conclude that Respondent's conduct evinced even a motive to engage in conduct similar to the attorneys in *Goldsborough* or *Hall*.

### III.    Conclusion

We conclude, based on the record before us, that Respondent's conduct, as determined by the hearing court, did not violate MLRPC 7.3 or 8.4. Therefore, the Petition for Remedial or Disciplinary Action is dismissed. *See Attorney Grievance Comm'n v. Rand*, 429 Md. 674,

---

[19]    The attorney's conduct in *Goldsborough* far exceeded the bounds of decency. Indeed, central to Bar Counsel's complaint in that matter was (1) the attorney's spanking of a client on multiple occasions, (2) his spanking and attempt to kiss a second female client, and (3) his repeated, and sometimes bare buttocks, spanking of a seventeen year-old assistant for making typographical errors. 330 Md. at 347-49, 624 A.2d at 505-06.

57 A.3d 976 (2012); *Attorney Grievance Comm'n v. Link*, 380 Md. 405, 844 A.2d 1197 (2004); *cf. Attorney Grievance Comm'n v. Stolarz*, 379 Md. 387, 842 A.2d 42 (2004).

**IT IS SO ORDERED.**

Circuit Court for Baltimore County
Case No. CAE13-15574

Argued: October 6, 2014

IN THE COURT OF APPEALS

OF MARYLAND

Misc. Docket AG No. 17

September Term, 2013

_____

ATTORNEY GRIEVANCE COMMISSION
OF MARYLAND

v.

PATRICK GUY SAMUEL MARIE MERKLE

_____

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

_____

Dissenting Opinion by Watts, J.,
which Harrell and Battaglia, JJ., join

_____

Filed:  November 24, 2014

Respectfully, I dissent. This is a worrisome attorney discipline proceeding against a lawyer who allegedly engaged in conduct that was prejudicial to the administration of justice. Specifically, serious allegations were made against Patrick Guy Samuel Marie Merkle ("Merkle"), Respondent, by his former client, Sheila Coates-Black ("Coates-Black"), who was allegedly a vulnerable person in an emotionally abusive relationship with her husband when Merkle represented her.

At its core, this attorney discipline proceeding illustrates an all-too-important point. Women, and members of the public in general, routinely turn to lawyers when they are vulnerable—*e.g.*, during divorce, child custody, and criminal proceedings and so forth. When a woman—or any person, for that matter—raises significant allegations of improper conduct against a lawyer, the person expects that the allegations will be resolved and that specific and detailed findings of fact will be made to enable this Court to determine whether the lawyer violated the Maryland Lawyers' Rules of Professional Conduct ("MLRPC"), and, if so, the appropriate sanction.

## (A) Coates-Black's Vulnerability

To begin, I would sustain the Commission's exception to the hearing judge's finding that there was no evidence that Coates-Black was emotionally vulnerable when Merkle represented her. Simply put, from my perspective, the hearing judge's finding is clearly erroneous.

The record amply demonstrates that Merkle was well aware that Coates-Black was in an abusive relationship and emotionally vulnerable when he represented her. On January 26, 2010, Merkle e-mailed Coates-Black, stating: "It is well time for you to be documenting

instances of emotional abuse. Date, time and manner." On March 1, 2010, Coates-Black e-mailed Merkle, stating: "I can []now longer deal with this mental and verbal abuse so I am asking if I need[] to move out before some[]thing dreadful happen[s.]" And, at the disciplinary hearing, Merkle testified that he was aware of the abusive situation, stating: "I have a pretty good deal of experience somewhere on the order of [fifteen] cases involving short[-]duration marriages with . . . violence, but [] Coates-Black, her violence is really emotional violence, this back and forth stuff with the . . . temporary protective orders[.]" Indeed, at the hearing, Merkle asked Coates-Black whether she had been "in an emotionally abusive arrangement staying" with her husband, and Coates-Black replied: "Sometimes." Coates-Black also testified that she sought protective orders against her husband because she had been "afraid" and because her husband had "bec[o]me so abusive."[1]

Yet, the hearing judge failed to address or make any findings of fact concerning Coates-Black's vulnerability other than to state: "Bar Counsel did not introduce any evidence of Coates[-Black]'s mental state at the hearing, yet argued in her closing that Coates was a vulnerable individual [of] who[m Merkle] took advantage[.]" This conclusory statement utterly fails to account for the evidence that leads to the inescapable conclusion that Coates-Black was, indeed, vulnerable. Based on all of the above evidence, the hearing judge clearly erred in finding that there was no evidence that Coates-Black was emotionally vulnerable when Merkle represented her.

---

[1]At oral argument, Merkle stated that Coates-Black was experiencing "turmoil . . . in her marriage" when he represented her.

### (B) Lack of Findings of Fact

Next, pursuant to Maryland Rule 16-759(c)(6),[2] I would remand for additional fact-finding concerning the alleged violation of MLRPC 8.4(d) (Conduct that is Prejudicial to the Administration of Justice).[3] Specifically, evidence offered by Bar Counsel indicated that Merkle, among other things: (1) "commented on" Coates-Black's attire while she was visiting him in his office, and later described Coates-Black's attire as having a "plunging neckline" and being "quite revealing from the middle"; (2) sat on the same side of his desk as Coates-Black while she was visiting him in his office and asked her to rub his shoulders, prompting Coates-Black to decline and move to the opposite side of Merkle's desk "to keep [him] away from" her; (3) attempted to visit Coates-Black at her apartment after 10:00 p.m.; and (4) offered, on multiple occasions, to let Coates-Black use an apartment in a building that he owned.[4] Despite this evidence, and despite the serious allegations of improper conduct that Coates-Black raised at the hearing, the hearing judge inexplicably

---

[2]Rule 16-759(c)(6) provides that this Court "may order . . . a remand" in an attorney discipline proceeding.

[3]I take no contrary position to the Majority's conclusions that Merkle did not violate MLRPC 1.2 (Scope of Representation and Allocation of Authority Between Client and Lawyer), 1.6 (Confidentiality of Information), or 7.3(a) (Direct Contact with Prospective Clients).

[4]The hearing judge found that: (1) shortly after their initial meeting in October 2008, Merkle e-mailed Coates-Black with information about a jazz club, stating: "[W]hen I heard that you went to a jazz club, this is what I thought of. I have been on the emailing list for Shore Jazz for years and keep them in mind"; (2) in 2009, Merkle and Coates-Black became friends on Facebook, and Merkle commented as follows on a photograph that Coates-Black had posted: "Maybe that's me on [Coates-Black's daughter]'s tattoo!" The hearing judge made no further findings of facts concerning these two matters. The record reveals that, in the e-mail, Merkle stated that he kept Shore Jazz "in mind for beach dates[.]"

failed to make any findings of fact whatsoever concerning these matters. The allegations were well-detailed and described Merkle's alleged improper and unseemly conduct toward Coates-Black, yet the hearing judge did not address or even mention them. Equally troubling is that, at oral argument, Merkle implied that he acted as a father figure to Coates-Black.[5] The potential that Merkle abused his position of power with a client who was in an emotionally vulnerable condition is troubling and cause for concern, to say the least. Yet, for unexplained reasons, the hearing judge failed to make any findings of fact concerning these matters.[6]

In sum, despite a myriad of evidence concerning Merkle's alleged improper conduct toward Coates-Black, the hearing judge oddly failed to make any findings of fact concerning Merkle's conduct and conclude whether the conduct was a violation of MLRPC 8.4(d). To remedy this obvious defect, I would remand this attorney discipline proceeding to the hearing judge with instructions to make findings of fact as to Merkle's alleged improper behavior toward Coates-Black and conclude whether such behavior was a violation of MLRPC 8.4(d). Again, women—and all persons who are represented by lawyers—expect that allegations concerning the lawyers' misconduct will be adequately resolved by hearing judges in attorney discipline proceedings and, ultimately, addressed

---

[5]Specifically, Merkle stated: "I have a lot of dialogue with a lot of people where I'm kinda like the dad. And [] Coates[-Black] was one of these people."

[6]In one instance, after summarizing an incident in which Merkle accepted medication from Coates-Black and was lying on her bed, the hearing judge found that Merkle "did not make any inappropriate comments or gestures towards [] Coates[-Black]." This conclusory statement regarding one instance of alleged misconduct does not suffice to address the multiple allegations of Merkle's improper conduct and the evidence offered at the hearing.

- 4 -

by this Court.  Respectfully, I dissent.

Judge Harrell and Judge Battaglia have authorized me to state that they join in this opinion.